[No. D060033. Fourth Dist., Div. One. July 26, 2012.]

In re Z.A., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
Z.A., Defendant and Appellant.

## Counsel

Law Office of E. Hong and Esther Kim Hong for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland and Gil Gonzalez, Assistant Attorneys General, Jennifer A. Jadovitz and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

AARON, J.—

### I.

### INTRODUCTION

Authorities at the San Ysidro port of entry, at the border between Mexico and the United States, discovered approximately 36 pounds of marijuana hidden in a car in which Z.A., a minor, was riding as a passenger. The People filed a petition pursuant to Welfare and Institutions Code section 602 charging Z.A. with two counts of transporting more than 28.5 grams of marijuana (Health & Saf. Code, § 11360, subd. (a))[1] (counts 1, 2), and one count of possessing marijuana for sale (§ 11359) (count 3). After an adjudication hearing, the juvenile court found the allegations to be true. At a subsequent disposition hearing, the court committed Z.A. to the "Short Term Offender Program" for a period of 90 days.

On appeal,[2] Z.A. contends that the juvenile court erred in admitting evidence of statements she made to law enforcement officers during a

---

[1] Unless otherwise specified, all subsequent statutory references are to the Health and Safety Code.

[2] On June 29, 2011, Z.A. filed a notice of appeal purporting to appeal from the June 15 adjudication order. Also on June 29, the court held the disposition hearing and committed Z.A. to the Short Term Offender Program.

The disposition order is the final step in a Welfare and Institutions Code section 602 proceeding, and constitutes an appealable judgment. (*In re Henry S.* (2006) 140 Cal.App.4th 248, 255 [44 Cal.Rptr.3d 418]; *In re James J.* (1986) 187 Cal.App.3d 1339, 1342 [232 Cal.Rptr. 456].) While an adjudication order sustaining a Welfare and Institutions Code section 602

custodial interrogation on the night of her arrest. Z.A. claims that the statements were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*) and its progeny. Z.A. also claims that there is insufficient evidence to support the true findings on all of the counts.[3]

We conclude that the juvenile court committed reversible error in admitting certain statements that Z.A. made during the interrogation. Specifically, we conclude that the statements were inadmissible to prove Z.A.'s guilt because they were improperly obtained after Z.A. had invoked her right to remain silent. Accordingly, we reverse the judgment. However, because we conclude that there is sufficient evidence to support the trial court's true findings on all counts, retrial is not barred on remand.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The prosecution's evidence*

On May 5, 2011, John Adkisson drove a Mitsubishi Eclipse from Mexico to the port of entry at San Ysidro. Adkisson's girlfriend, 17-year-old Z.A., was in the front passenger seat. A drug detection dog showed interest in the car. Customs and Border Protection Officer Hector Ibarra approached the car and briefly interviewed Adkisson. According to Officer Ibarra, while he was questioning Adkisson, Z.A. appeared "stiff" and "nervous." Ibarra said that Z.A. was "intensely looking" at a "handheld video game," and would not look at him. Officer Ibarra escorted Adkisson and Z.A. and their car to a secondary screening area.

Once they arrived at the secondary screening area, Officer Ibarra searched the car. Officer Ibarra discovered a brown package in a hidden compartment

---

petition is not itself independently appealable, the propriety of the adjudication order is subject to review on appeal from the dispositional judgment. (*In re Eric J.* (1988) 199 Cal.App.3d 624, 627 [244 Cal.Rptr. 861].) A notice of appeal is to be construed liberally, in favor of its sufficiency. (*In re Kenneth J.* (2008) 158 Cal.App.4th 973, 978 [70 Cal.Rptr.3d 352].)

In this case, Z.A.'s notice of appeal refers only to the nonappealable June 15 adjudication order. However, we construe Z.A.'s notice of appeal liberally as perfecting a valid appeal from the June 29 dispositional judgment.

[3] Z.A. also contends that the trial court abused its discretion in committing her to the Short Term Offender Program and that the trial court's dispositional order must be amended to state the maximum period of confinement and the amount of precommitment custody credits. We need not consider these claims in light of our reversal of the judgment.

behind the "glove box." After determining that the package contained "contraband," Officer Ibarra placed both Adkisson and Z.A. in handcuffs and took them to a security office. Authorities later determined that there were several packages in the compartment that contained a total of approximately 36 pounds of marijuana. Officers searched Adkisson and Z.A. They found $100 on Adkisson. Z.A. had no money.

Officer Ibarra agreed with defense counsel that the package he found had not been in "plain sight" and that a passenger in the car "couldn't see that there were drugs in the car simply by sitting in it."

Immigration and Customs Enforcement Agent Ethan Cramer interviewed Z.A. after her arrest. San Diego Police Officer Jorge Rosales assisted Agent Cramer in conducting the interview.[4] Agent Cramer testified at the adjudication hearing that after he read Z.A. her *Miranda* rights, Z.A. indicated that she would agree to speak with the officers. When Agent Cramer initially asked Z.A. why she was coming into the United States, she said that she and Adkisson were going shopping. Agent Cramer then asked Z.A. why the couple had been "crossing so many different vehicles," and Z.A. explained that Adkisson bought and sold cars at auctions. Z.A. initially maintained that she did not know that there were drugs in the car.

Agent Cramer agreed with the prosecutor that after this exchange, Z.A. began to "change her story." According to Agent Cramer, Z.A. said that she knew that Adkisson had friends in Tijuana who dealt in narcotics and that she had told him not to get involved, but he responded, " 'We need a way to pay for your pregnancy.' " At this point in the interview, Z.A. had not indicated that she knew there were drugs in the car.

Agent Cramer testified that Z.A. "changed [her story] a third time," saying that "she did know that there were narcotics in the vehicle, that the two of them had been crossing, [and] that [Adkisson] had told her he was building his crossing history." Z.A. said that she thought this was "the first time" that there were narcotics in a vehicle that she and Adkisson attempted to bring into the United States.

Agent Cramer stated that Z.A. admitted that she and Adkisson had picked up the Eclipse from an unknown man at a Home Depot in Tijuana.[5] According to Agent Cramer, Z.A. said that Adkisson had told her not to be nervous and that the dogs would not detect the drugs. Z.A. also told Agent Cramer that she believed Adkisson was being paid $1,000 for the job. Z.A.

---

[4] Officer Rosales acted primarily as a translator during the interrogation.

[5] Agent Cramer explained that Z.A. was able to give a physical description of the unknown man.

mentioned that Adkisson had told her about another young couple who had been working for the same drug trafficking organization who had been caught after the female became extremely nervous and attracted attention to their vehicle.

Agent Cramer also stated that Z.A. told him that a white truck had followed the vehicle that she and Adkisson were in as they drove toward the border, and that the truck had turned away just before they reached the border. Z.A. also told Agent Cramer that she and Adkisson were "supposed to take [the Eclipse] to a Wal-Mart parking lot on the United States side." Finally, Agent Cramer explained that officers had found approximately 36 pounds of marijuana in the Eclipse, and that this quantity would not be for personal use, but instead, would be for "distribution and sale."

## B. *The defense*

Z.A.'s mother testified that she knew both Z.A. and Adkisson well, and that to her knowledge, neither Adkisson nor Z.A. had ever possessed drugs.

Z.A. testified that she crossed the border with Adkisson on the day in question because she thought he was "going to see somebody else," explaining that she believed that Adkisson had been cheating on her. According to Z.A., after initially refusing to let Z.A. come with him, Adkisson finally agreed.

Z.A. stated that she believed one of Adkisson's friends had loaned him the car. She did not think it was strange that someone was lending Adkisson a car, because she had crossed over the border with Adkisson in several different cars. Z.A. said that during her previous crossings with Adkisson, she had never seen anything that made her believe he was involved in crossing drugs.

Z.A. explained that as she and Adkisson approached the border on the day in question, Adkisson "out of nowhere" began to tell her a story about a friend of his who had been detained when the friend and his girlfriend attempted to smuggle drugs across the border. Z.A. also said that after the dog alerted on the Eclipse, Adkisson told her, " 'Don't worry.' " At that point, Z.A. did not know what Adkisson was telling her not to worry about. While the car was being searched, Adkisson told Z.A. that he was going to get in trouble. Z.A. did not think she would be in trouble because she had "nothing to do with that." Z.A. said that she had not been promised any money and that she had played no role in the smuggling attempt. Z.A. was surprised when Adkisson told her that agents had found drugs in the car.

On cross-examination, Z.A. acknowledged having gone with Adkisson to pick up the Eclipse at a Home Depot, and that a white truck had followed

them as Adkisson drove to the border. Z.A. also acknowledged having told Agent Cramer that it was the first time that she was "crossing drugs." The prosecutor also asked Z.A., "And you were asked by [Agent Cramer] why you went with [Adkisson] that day, and you told him [*sic*] that nothing was going to happen, that you shouldn't get nervous, and that the dogs are not going to smell it; [Adkisson's] sure no one was going to notice." Z.A. responded in the affirmative. Z.A. also explained that she "imagined" that Adkisson would be paid $1,000. She said that she knew that Adkisson had been trying to build up his crossing history, but maintained that she did not know why.

## III.

## DISCUSSION

A. *The juvenile court committed reversible error in admitting statements that Z.A. made during a custodial interrogation after she had invoked her right to remain silent*

Z.A. contends that the trial court committed reversible error in denying her motion to suppress statements that she made during the custodial interrogation, after she had invoked her right to remain silent. Specifically, Z.A. contends that the statements were inadmissible to prove her guilt because they were obtained in violation of *Miranda* and its progeny.[6]

1. *Factual and procedural background*

a. *The interrogation*[7]

Agent Cramer and Officer Rosales interrogated Z.A. after her arrest. Agent Cramer began the interrogation by informing Z.A. that law enforcement

---

[6] Z.A. also claims that the trial court erred in admitting all of her statements from the interrogation because they were not made voluntarily. We need not consider this contention in light of our reversal.

[7] The trial court ruled on the motion to suppress based on two transcripts of portions of the interrogation, which together appear to constitute the entire interrogation. The defense offered a transcript of a portion of the interrogation that ends just after Z.A. invoked her right to remain silent. The People offered a transcript of the remainder of the interrogation. The interrogations were conducted partially in Spanish, and have been translated into English, and transcribed. We include only the English portions of the transcripts in this opinion. The record on appeal does not contain any audio or visual recording of the interrogation.

Agent Cramer testified concerning the interrogation during the adjudication hearing. We have summarized his testimony in part II.A., *ante*. However, the transcripts of the interrogation were not offered in evidence at the hearing.

officers "found drugs in your car." After obtaining some biographical information from Z.A., Agent Cramer informed Z.A. of her *Miranda* rights, including the right to remain silent. Z.A. stated that she understood her rights, that she waived those rights, and that she agreed to speak with the officers.

The officers informed Z.A. that they had spoken to Adkisson, and said to her, "He told us what happened," and "He told us what you knew." The officers warned Z.A. that since Adkisson had told them the truth, "your stories have to match up." The officers then asked Z.A. several questions concerning whether Adkisson owned the car in which she and Adkisson had been stopped. Z.A. initially said that Adkisson's "dad had given [the car] to him." After Agent Cramer responded, "That's not true," Z.A. told the officers that Adkisson had gotten the car at an auction. The officers then told Z.A. that they knew that Adkisson had previously driven several different cars across the border, and Z.A. suggested that he had done so as part of a car selling business. Agent Cramer again expressed disbelief and told Z.A. that he knew "about everything."

Shortly thereafter, Agent Cramer asked Z.A., "[Y]ou knew what [Adkisson] was doing[,] right?" Z.A. responded, "I don't even know why I'm getting mixed up in this problem. Had I known, I wouldn't even have come along for anything."

Agent Cramer told Z.A. that Adkisson had said that Z.A. knew Adkisson "was driving cars across" and said, "He says that you guys would drive cars across and then turn around and come straight back to the bar . . . ." Agent Cramer then stated, "you did this a lot of times." Shortly thereafter, Officer Rosales asked Z.A., "Is that the truth?" Z.A. replied, "Yes, I think [Adkisson] told the truth." Officer Rosales attempted to clarify Z.A.'s response by asking, "Ok then, are [you] saying now that you did know what [Adkisson] was doing, yes or no?" After additional exhortations by the officers to tell the truth, Z.A. responded, "I don't know what to say." Z.A. explained, "It's just that I can't tell you everything because I don't know everything. There is [*sic*] a lot of things I don't know and you're asking me about things he told you that are true, but . . . (sighs) I don't know . . . ." Z.A. then said that she knew that Adkisson "knows people that do other stuff." Z.A. said she did not like it when those people would "come around the house and talk to [Adkisson]." Officer Rosales asked, "[W]hen you crossed in cars . . . what did you think?" Z.A. responded that she did not know what to think.

Shortly after this exchange, Officer Rosales engaged in the following colloquy with Z.A.:

"[Officer Rosales]: . . . but he didn't tell you why he was crossing these cars?

"[Z.A.]: . . . mmm . . .

"[Officer Rosales]: . . . so he told you . . .

"[Z.A.]: . . . yes

"[Officer Rosales]: . . . he told you he was crossing several cars?

"[Z.A.]: . . . I do . . . I don't want to answer anymore [*sic*] questions."[8]

Immediately after Z.A. stated that she did not want to answer any more questions, the following colloquy occurred:

"[Z.A.]: . . . no, well I want to know if [Adkisson] is going to stay here how much time.

"[Agent Cramer]: . . . I need for you tell me the truth, OK? I'm sittin[g] . . . look at me, look at me. I'm sitting here and I know you know a lot more than what you are telling me, OK? [Adkisson] . . . the good news is today that you guys didn't have that much drugs, OK? I deal every day . . . every day I do this and I deal with meth and like coke and heroin, OK? Very hard drugs, OK? But, at the same time, like you guys smuggled marijuana in, OK? And you and like [*sic*] there are consequences like that, that go with that, OK? You understand that right? So, it's not like [Adkisson] is going to go away for a long long time, OK? I can like tell you that. That's not going to happen. . . .

"[Z.A.]: . . . (indistinct) . . .

"[Agent Cramer]: I can't tell you that. What I do know, is that he did tell me the truth, OK? And he told me what you knew, and what you don't know. So, I'm not expecting you to make anything up, OK? But, I need you to tell me the truth so that it shows you 're cooperating, OK? If you don't tell me the truth, it makes it look like you know more than you do. You understand that? Do you understand what I just said? Ok.

"[Z.A.]: . . . yes . . . (sighs) . . . .

"[Agent Cramer]: . . . so you telling me the truth today [*sic*] . . . I already know, I already know what you know, OK? You're not . . . you're not going

---

[8] The ellipses are in the transcript contained in the record. We have reproduced portions of the transcript without editing them, other than to insert the names of the speakers.

get [Adkisson] in . . . you['re] not gonna like say something he didn't tell me, cause I know he told you everything. Alright, now it looks like you're hiding a lot!

"[Z.A.]: It does?"

Agent Cramer then told Z.A. that hiding information "doesn't look good for when I have to ask [*sic*] my report." Agent Cramer explained that he would be preparing a report to give to a judge. Agent Cramer continued, "You knew what [Adkisson] was doing. But I need you to tell me what he told you."

At this point, Z.A. asked Agent Cramer if they could make a deal, stating, "If you tell me just one thing that [Adkisson] told you and it's the truth I'm going to know it [*sic*] true and I will tell you everything you want to know." Agent Cramer responded that he was not going to play "games" and again exhorted Z.A. to tell the truth. Z.A. proceeded to make a number of admissions. For example, Agent Cramer asked, "Why do you think he was crossing drugs today?" and Z.A. responded, "I can swear that if he—I can swear that the first time was today." Shortly thereafter, Agent Cramer asked, "Why did you go with him?" Z.A. responded, "Because—because he told me that—that nothing was going to happen. That—not to get nervous. That—not to worry. He told me that I swear that—that the dogs are not going to smell it. I'm sure no one is going to notice."

Z.A. also told the officers that she believed Adkisson would be paid "like a thousand" dollars for crossing the drugs. After Agent Cramer said, "Don't do this again, okay? Okay this is your first time, okay?" Z.A. interrupted and said, "I'm not going to do it again. I can't cross." Z.A. also admitted that she had seen the man for whom Adkisson was working on one occasion, but said that she did not know his name. After giving a physical description of the man, Z.A. explained that she had accompanied Adkisson to a parking lot earlier that day where the man told Adkisson to wait. After approximately two hours, Z.A. noticed that the man was back in the parking lot, with a car that Adkisson and Z.A. were to drive across the border. Z.A. explained that Adkisson told her that they were going to take the car to a Wal-Mart in the United States. Z.A. noticed that a white truck followed her and Adkisson as he drove the car to the border, but that the truck stopped following them before they reached the border. Z.A. also told the officers that Adkisson had told her a story about a "guy" and a "girl" who had been caught attempting to transport drugs across the border after the girl became nervous. Adkisson told Z.A. "not to get nervous because the same thing could happen to me."

### b. *Z.A.'s motion to suppress*

Prior to trial, Z.A. filed a motion to suppress statements that she made during the interrogation. Z.A. contended that all of the statements from the interrogation should be suppressed because they were involuntary. In the alternative, Z.A. maintained that all of the statements that she made after she invoked her right to remain silent during the interrogation should be suppressed as a violation of *Miranda* and its progeny. With respect to her *Miranda* claim, Z.A. argued in part: "[W]hen [Z.A.] attempted to exercise her right to not answer questions and remain silent, the officers ignored her request. They did not even pause in their questions. The officer continued to question her and even began to hint at leniency for her and her boyfriend if she just tells the truth. The officer says that this [case] didn't involve 'hard drugs' and her boyfriend is not going to go away for a long time."

Quoting *Miranda* and *Michigan v. Mosley* (1975) 423 U.S. 96, 103–104 [46 L.Ed.2d 313, 96 S.Ct. 321] (*Mosley*), Z.A. noted that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " Z.A. contended that "after [she] attempted to cut off questioning by clearly stating 'I don't want to answer any more questions,' the officers in no way scrupulously honor[ed] this request." Rather, Z.A. argued, the officers continued the interrogation and thereby violated *Miranda* and its progeny.

In their opposition to Z.A.'s claim that her statements were obtained in violation of *Miranda*, the People acknowledged that it is well established that all interrogation must cease after a person in custody invokes her right to remain silent. However, citing *Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] (*Edwards*) and *Oregon v. Bradshaw* (1983) 462 U.S. 1039 [77 L.Ed.2d 405, 103 S.Ct. 2830] (*Bradshaw*), the People argued that under some circumstances, further interrogation is permissible after a suspect invokes her *Miranda* rights. The People noted that in determining whether custodial statements are admissible under *Edwards* and *Bradshaw*, a court is required to undertake a "two-step" analysis. The first step is for the trial court to determine whether the suspect "initiated further conversation," with the police after invoking her *Miranda* rights. The People argued that Z.A. had initiated further "conversation" with the officers by asking, "[N]o, well I want to know if [Adkisson] is going to stay here how much time."

Assuming that the trial court finds that the suspect reinitiated the conversation with the police, the People contend that the court must then determine "whether there was thereafter a valid waiver of *Miranda* rights, and whether

the waiver was knowingly and voluntarily made under the totality of the circumstances." (See *Bradshaw, supra*, 462 U.S. at p. 1045.) With respect to this prong of the *Edwards* and *Bradshaw* two-step inquiry, the People argued that Z.A. had expressly waived her right to remain silent at the outset of the interrogation, and that she had "impliedly waived her right [to remain silent] by continuing her interview . . . without an unequivocal indication that she wished to terminate."

After a hearing at which the juvenile court heard oral argument from defense counsel and the prosecutor, the court denied Z.A.'s motion to suppress, reasoning:

"You know, there's communication. And the minor, here, said, 'I don't want to answer any more questions,' but then she turns right around and starts the communication again. And from what I read in this case I think the law is clear. And we all know that *Miranda* has been—many, many inroads have been made on *Miranda* over the years.

"The fact is that she then initiated further communication and the officer obliged her and then started to talk to her again. And what she wanted to do was to learn about what's going to happen to her boyfriend and—but in that, then she says—she's literally tried to make a bargain with them. You know, if he said this, then I'll tell you everything.

"Now that didn't end this inquiry. She hemmed it up and she made a bargain, and he—the officer, which was his—I believe, not only his right but his duty to go forward and find out what's happened. And so your motion is denied."

2. *Governing law*

a. *Miranda*

In *People v. Williams* (2010) 49 Cal.4th 405, 425 [111 Cal.Rptr.3d 589, 233 P.3d 1000] (*Williams*), our Supreme Court provided a summary of the law governing *Miranda* claims:

█ "The [United States Supreme Court] has stated in summary that to counteract the coercive pressure inherent in custodial surroundings, '*Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. [Citation.] After the warnings are given, if the suspect indicates that he

wishes to remain silent, the interrogation[9] must cease. [Citation.] Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. [Citation.] Critically, however, a suspect can waive these rights. [Citation.] To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the "high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst* [(1938)] 304 U.S. 458 [82 L.Ed. 1461, 58 S.Ct. 1019]." ' [Citation.]

" 'The prosecution bears the burden of demonstrating the validity of the defendant's waiver by a preponderance of the evidence.' [Citations.] In addition, '[a]lthough there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was [voluntary,] knowing[,] and intelligent under the totality of the circumstances surrounding the interrogation.' [Citation.] On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence. [Citation.]"

Where a "defendant is a minor, the required inquiry 'includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " (*People v. Lessie* (2010) 47 Cal.4th 1152, 1169 [104 Cal.Rptr.3d 131, 223 P.3d 3].)

"Statements obtained in violation of *Miranda* are inadmissible to establish guilt." (*Sims, supra*, 5 Cal.4th at p. 440.)

> b. *Law enforcement officers must "scrupulously honor" a suspect's invocation of the right to remain silent*

 "Once [*Miranda*] warnings have been given, '[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.' [Citation.] Once such a request is made, it must be 'scrupulously honored' [citation]; the police may

---

[9] "[I]nterrogation (as well as reinterrogation following an invocation of rights) that requires a preceding admonition and waiver of *Miranda* rights encompasses both express questioning and its 'functional equivalent.' (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300–301 [64 L.Ed.2d 297, 100 S.Ct. 1682].) 'That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . .' (446 U.S. at p. 301 . . . , fns. omitted.)" (*People v. Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992] (*Sims*).)

not attempt to circumvent the suspect's decision 'by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.' ([*Mosley, supra,*] 423 U.S. [at pp.] 105–106 . . . .)" (*People v. Wash* (1993) 6 Cal.4th 215, 238 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

"In *Mosley*, despite the defendant's invocation of the right to remain silent, the high court declined to find a *Miranda* violation because 'the police . . . immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.' ([*Mosley,*] *supra*, 423 U.S. at p. 106.)" (*People v. Martinez* (2010) 47 Cal.4th 911, 950 [105 Cal.Rptr.3d 131, 224 P.3d 877] (*Martinez*).)

In *Edwards*,[10] *supra*, 451 U.S. at pages 484–485, the United States Supreme Court held that a suspect may waive a previously invoked right to counsel under *Miranda* by reinitiating a conversation with law enforcement *and* again waiving the right to counsel. The *Edwards* court made clear that in addition to reinitiating a conversation with law enforcement officers, the suspect must also provide a "valid waiver of the right to counsel and the right to silence" (*Edwards, supra*, at p. 486, fn. 9), before the interrogation may continue. (See *Bradshaw, supra*, 462 U.S. at p. 1045 ["the Oregon Court of Appeals was wrong in thinking that an 'initiation' of a conversation or discussion by an accused not only satisfied the *Edwards* rule, but *ex proprio vigore* sufficed to show a waiver of the previously asserted right to counsel"]; *Bradshaw, supra*, at p. 1046 ["[s]ince there was no violation of the *Edwards* rule in this case, the next inquiry was 'whether a valid waiver of the right to counsel and the right to silence had occurred . . .' "].)[11]

In *Sims, supra*, 5 Cal.4th at page 441, the California Supreme Court applied *Bradshaw* and concluded that a suspect's "offhand question as to 'what was going to happen from this point on' (coupled with a reference to

---

[10] As discussed in part III.A.3., *post*, in both *Edwards* and *Bradshaw*, the suspect invoked both his right to counsel and his right to remain silent. It is undisputed that Z.A. invoked only her right to remain silent, and did not invoke her right to counsel. For this reason, we are of the view that *Mosley* controls. However, because the People specifically contend that Z.A.'s statements were admissible pursuant to *Edwards* and *Bradshaw*, we discuss those cases, and their progeny, in the text.

[11] In *Bradshaw*, the court further refined the reinitiation prong by stating that statements by an accused "relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." (*Bradshaw, supra*, 462 U.S. at p. 1045.) In contrast, an accused's statements that evince a "willingness and a desire for a generalized discussion *about the investigation*," do constitute reinitiation under *Edwards*. (*Bradshaw, supra*, at pp. 1045–1046, italics added.)

extradition), which he posed to the police officers as they prepared to leave . . . did not open the door to interrogation after previously having invoked his *Miranda* rights." The *Sims* court noted that the *Bradshaw* court had concluded that the defendant in that case had " 'initiated' " further conversation with regard to the investigation by stating, " ' "Well, what is going to happen to me now?" ' " (*Sims, supra,* at p. 441, quoting *Bradshaw, supra,* 462 U.S. at p. 1042.) However, the *Sims* court observed that the *Bradshaw* court had concluded that the "defendant's limited inquiry in itself *did not 'suffice*[] *to show a waiver of the previously asserted right to counsel.*' " (*Sims, supra,* at p. 441, quoting *Bradshaw, supra,* at p. 1045.) In light of this law, the *Sims* court concluded that Sims's question did not constitute a waiver of his *Miranda* rights: "As with the suspect's initial question in *Bradshaw,* defendant's remark in the present case—asking the police officers what was going to happen to him with reference to extradition—cannot, in itself, properly be construed as constituting a waiver of previously invoked rights. And here, unlike the case in *Bradshaw,* the Glendale officers did not reiterate the *Miranda* admonition or procure from defendant a waiver of his rights." (*Sims, supra,* at p. 441.)

The *Sims* court also acknowledged that a defendant may make statements that are "ambiguous remarks . . . relating to—but falling short of—a clear waiver or invocation of *Miranda* rights." (*Sims, supra,* 5 Cal.4th at p. 442, fn. 7.) When an accused makes such ambiguous statements, "the police [are justified] in asking further questions to clarify whether the accused understands or seeks to waive his or her rights." (*Ibid.*) The *Sims* court concluded, however, that the "[d]efendant's inquiry relating to extradition" in that case was "clearly distinguishable" from remarks justifying a request for clarification from the police. (*Ibid.*)

The *Sims* court also discussed the officer's response to Sims's question, stating, "In reply to defendant's inquiry, [the officer] pursued a line of conversation far exceeding the scope of any answer legitimately responsive to a question concerning extradition." (*Sims, supra,* 5 Cal.4th at p. 442.) The *Sims* court concluded that the officer had improperly responded to Sims's question by engaging in the functional equivalent of interrogation: "Here, defendant's questions relating to extradition were 'natural, if not inevitable' in light of his having been arrested in Nevada after committing murders in two other states. The reply of Officer Perkins, focusing upon the investigation, and confronting defendant with the evidence linking him to the crimes, was nonresponsive to this inquiry and served no legitimate purpose incident to defendant's arrest or custody. Instead, the officer's conduct amounted to the application of a 'technique of persuasion' viewed by United States Supreme Court decisions as likely to induce defendant to attempt to defend— and thus incriminate—himself. [Citation.] The use of such a technique under

these circumstances thus constituted custodial interrogation. [Citations.]" (*Sims, supra*, at pp. 443–444.)

The *Sims* court further concluded that statements that Sims made in response to the improper interrogation should have been suppressed, noting, "The present case illustrates the ease with which the bar imposed by the suspect's invocation of rights could be dissipated if that invocation is not scrupulously honored." (*Sims, supra*, 5 Cal.4th at p. 444.)

3. *The juvenile court erred in admitting statements that Z.A. made after she had invoked her right to remain silent during the custodial interrogation*

It is undisputed that Z.A. was subjected to custodial interrogation and that, after having initially waived her right to remain silent, Z.A. unambiguously invoked that right by telling her interrogators, "I do . . . don't want to answer anymore [*sic*] questions." In their respondent's brief, the People do not dispute that Z.A. validly and unambiguously invoked her right to remain silent, stating, "the only issue here is whether [Agent] Cramer should have stopped questioning appellant after [Z.A.] stated that she did not want to answer any more questions."

a. *The People's theory of admissibility is without merit*

The People contend that in determining whether Agent Cramer should have ceased his interrogation, this court must apply *Edwards* and *Bradshaw* and determine whether, after her invocation, Z.A. "initiate[d] further communication . . . with the police" (*Edwards, supra*, 451 U.S. at p. 485) in a manner that can be "fairly said to represent a desire . . . to open up a more generalized discussion relating directly or indirectly to the investigation." (*Bradshaw, supra*, 462 U.S. at p. 1045.)[12]

The United States Supreme Court has never held that *Edwards* and *Bradshaw*, both of which involved a suspect's invocation of the *right to counsel*, apply after a suspect invokes her *right to remain silent*. (See *People v. Boyer* (1989) 48 Cal.3d 247, 273 [256 Cal.Rptr. 96, 768 P.2d 610], disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588] [noting distinction between law to be applied in considering *Miranda* claims premised on a suspect's invocation of the right to remain silent rather than the right to counsel].) Nevertheless, because it was the People's burden to demonstrate that Z.A. validly waived

---

[12] In part III.A.3.b., *post*, we discuss whether Z.A.'s statements were admissible under *Mosley, supra*, 423 U.S. 96, which governs the admissibility of statements made after a suspect has invoked her right to remain *silent*, but has not invoked the right to *counsel*.

her *Miranda* rights (*Williams, supra*, 49 Cal.4th at p. 425), we consider the People's theory of admissibility and assume for purposes of this opinion that the People are correct that the reasoning of *Edwards* and *Bradshaw* applies to the facts of this case.

As noted above, both *Edwards* and *Bradshaw* make clear that postinvocation statements are admissible under those cases only where the People demonstrate both that the suspect reinitiated conversation with law enforcement officers, and that the suspect waived any previously invoked *Miranda* rights. (*Edwards, supra*, 451 U.S. at p. 486, fn. 9; *Bradshaw, supra*, 462 U.S. at pp. 1045, 1046.) The People contend in their brief on appeal that by stating, "[W]ell, I want to know if [Adkisson] is going to stay here how much time," Z.A. expressed a desire to have a "generalized discussion relating directly or indirectly to the investigation." (*Bradshaw, supra*, at p. 1045.) Viewed in context, Z.A.'s statement, "[W]ell, I want to know if [Adkisson] is going to stay here how much time," cannot reasonably be deemed an invitation to reinitiate a "generalized discussion relating directly or indirectly to the investigation" (*ibid.*), particularly since she had just told the officers that she did not want to answer any more questions. It appears that rather than reinitiating discussion of the investigation, Z.A. was inquiring as to how long her boyfriend would have to remain at the port of entry, or, at most, how much time he would have to serve in custody if he were found guilty of transporting drugs. As such, Z.A.'s question concerned the "routine incidents of the custodial relationship, [that] will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." (*Ibid.*) Z.A.'s question, "[W]ell[,] I want to know if [Adkisson] is going to stay here how much time," is akin to the defendant's question in *Sims*—" 'what was going to happen from this point on' " (*Sims, supra*, 5 Cal.4th at p. 441), which the California Supreme Court held did *not* constitute reinitiation under *Edwards* and *Bradshaw*. Z.A.'s statement was even less an initiation of a conversation about the investigation than was the question at issue in *Sims*, in that Z.A.'s statement did not even pertain to herself, but rather to Adkisson.

Even assuming that Z.A.'s statement satisfied the reinitiation prong of *Edwards* and *Bradshaw*, the People fail to present any argument on appeal that after making this statement, Z.A. waived her previously invoked right to remain silent prior to Agent Cramer resuming the interrogation, as is required under *Edwards, Bradshaw*, and *Sims*. Instead, the People simply ignore the prong of *Edwards* and *Bradshaw* that requires a renewed waiver and argue, "this Court should find that [Z.A.] voluntarily initiated further conversation, and therefore, no violation of *Miranda* occurred." Our Supreme Court has expressly held that merely establishing that an accused reinitiated a conversation with law enforcement is insufficient to permit further interrogation under

*Edwards* and *Bradshaw*. (*Sims, supra,* 5 Cal.4th at p. 440 [noting that "the initiation of further dialogue by the accused . . . does not in itself justify reinterrogation"].)

In the trial court, the People acknowledged that it was their burden to demonstrate both that Z.A. had reinitiated conversation about the investigation *and* that she had thereafter validly waived her right to remain silent.[13] The People attempted to meet this burden by arguing that Z.A. had expressly waived her right to remain silent at the outset of the interrogation, and that "[Z.A.] impliedly waived her right [to remain silent] by continuing her interview . . . without an unequivocal indication that she wished to terminate." We disagree. Z.A.'s statement, "I don't want to answer anymore [*sic*] questions," constitutes an unequivocal invocation of her right to terminate the interrogation. (See *Berghuis v. Thompkins* (2010) 560 U.S. ___, ___ [176 L.Ed.2d 1098, 130 S.Ct. 2250, 2260] [stating that suspect may "invoke[] his ' "right to cut off questioning . . ." ' [citation]" by stating that "he did not want to talk with the police"].) The People's suggestion in the trial court that Z.A. did not unequivocally indicate her desire to terminate the interrogation is thus without merit. With respect to the People's contention that Z.A.'s statement to Agent Cramer concerning Adkisson constituted an implied waiver of her right to remain silent, our Supreme Court in *Sims* expressly rejected the argument that a suspect's mere reinitiation of a conversation with officers constitutes an implied waiver of *Miranda* rights. (*Sims, supra,* 5 Cal.4th at p. 441.)

In addition, *Sims* makes clear that, at a minimum, in the wake of Z.A.'s unambiguous invocation of her right to remain silent, Agent Cramer should have attempted to "clarify whether the accused understands or seeks to waive his or her rights," after her statement concerning Adkisson's custody status. (*Sims, supra,* 5 Cal.4th at p. 442, fn. 7.) However, Agent Cramer made no such attempt and, as in *Sims*, failed to "reiterate the *Miranda* admonition or procure from defendant a waiver of [the defendant's] rights." (*Id.* at p. 441.) In addition, as discussed in greater detail below, as in *Sims*, "In reply to defendant's inquiry, [the officer] pursued a line of conversation far exceeding the scope of any answer legitimately responsive to [defendant's] question . . . ." (*Id.* at p. 442.)

In short, rather than responding to Z.A.'s statement about Adkisson's custody status by readmonishing Z.A. and asking her again whether she

---

[13] As noted in part III.A.1.b., *ante*, in the trial court, the People stated that in determining whether custodial statements are admissible under *Edwards* and *Bradshaw*, a court is required to undertake a "two-step" analysis, in which the "first prong asks whether the minor initiated further conversation," and the "second prong asks . . . whether there was a valid waiver . . . [that] was made knowingly and voluntarily."

wished to waive her right to remain silent or clarifying whether Z.A. intended to waive the right to remain silent that she had just invoked and continue with the questioning, Agent Cramer simply ignored Z.A.'s invocation and intensified his interrogation. Accordingly, even assuming that the People are correct that *Edwards* and *Bradshaw* apply in this case, we conclude that Z.A.'s postinvocation statements were not admissible under the reasoning of the cases discussed above. (See *Sims, supra*, 5 Cal.4th at pp. 441–446 [concluding statements inadmissible under *Edwards* and *Bradshaw* where police responded to suspect's postinvocation question with nonresponsive interrogation and failed to readmonish suspect and obtain a fresh waiver of *Miranda* rights].)

 b. *Z.A.'s postinvocation statements were inadmissible under* Miranda *and* Mosley

Under *Miranda, supra*, 384 U.S. 436 and *Mosley, supra*, 423 U.S. 96, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " (*Mosley, supra*, at p. 104; see *Berghuis v. Thompkins, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2259] ["police must ' "scrupulously hono[r]" ' this 'critical safeguard' when the accused invokes his or her ' "right to cut off questioning," ' " quoting *Mosley, supra*, at p. 103, quoting *Miranda, supra*, at pp. 474, 479].) The admissibility of statements made after a suspect has invoked the right to remain *silent* but has not invoked the right to counsel, is governed by these cases.

██ In this case, Z.A. unambiguously invoked her right to remain silent by expressly stating that she did not want to answer any more questions during the interrogation. Immediately thereafter, Z.A. made a statement to the officers about Adkisson's custody status, stating, "[W]ell[,] I want to know if [Adkisson] is going to stay here how much time." Rather than expressing a desire to resume the interrogation, Z.A.'s statement is more reasonably interpreted as expressing her interest in knowing whether, and for how long, her boyfriend was to remain detained at the border crossing. At a minimum, an officer " 'scrupulously honor[ing]' " (*Mosley, supra*, 423 U.S. at p. 104) a minor's invocation of her right to remain silent—asserted just seconds earlier—,[14] would have attempted to clarify whether Z.A. intended for her statement to retract her invocation and permit the resumption of the interrogation. (*People v. Johnson* (1993) 6 Cal.4th 1, 27 [23 Cal.Rptr.2d 593, 859 P.2d 673], overruled on another ground in *People v. Rogers* (2006) 39 Cal.4th 826,

---

[14] (Compare with *Martinez, supra*, 47 Cal.4th at p. 950 [noting that "[i]n *Mosley*, the time elapsed between the invocation of the right to silence and the reinterrogation was 'more than two hours' " and finding no *Mosley* violation where the "detectives waited overnight to approach defendant again . . ."].)

879 [48 Cal.Rptr.3d 1, 141 P.3d 135] ["if a defendant expresses ambiguous remarks falling short of a clear waiver or invocation of his *Miranda* rights, the officers may continue talking with him for the limited purpose of clarifying whether he is waiving or invoking those rights"].) After Z.A.'s invocation, the officers did not readmonish Z.A. concerning her right to remain silent or inquire as to whether she wanted to resume the interrogation. Again, an officer who intended to "scrupulously honor[]" (*Mosley, supra,* 423 U.S. at p. 104) Z.A.'s invocation of her right to remain silent would have provided such an admonition, particularly since Z.A. was a minor with no prior criminal history.[15] (See *People v. Lessie, supra,* 47 Cal.4th at p. 1169 [courts must consider minor's age and background in analyzing *Miranda* claim of a juvenile]; compare with *Martinez, supra,* 47 Cal.4th at p. 950 [finding no *Mosley* violation where detectives reminded adult defendant of *Miranda* rights read to him the night before and "on at least four prior occasions," asked defendant "whether he still wanted to talk," and defendant responded affirmatively].)

Rather than providing a responsive answer to Z.A.'s query concerning her boyfriend's status, Agent Cramer used the opportunity to direct a barrage of additional statements to Z.A. that were the functional equivalent of interrogation, in that he "should [have] know[n] [that the statements] [were] reasonably likely to elicit an incriminating response from [Z.A.]." (*Rhode Island v. Innis, supra,* 446 U.S. at p. 301, fns. omitted (*Innis*).)

Specifically, Agent Cramer:

—exhorted Z.A. to "tell the truth" and thereby directly sought to elicit a response from Z.A. (see *Innis, supra,* 446 U.S. at p. 301 [interrogation includes words "police should know are reasonably likely to elicit an incriminating response"]; *Fleming v. Metrish* (6th Cir. 2009) 556 F.3d 520, 552 [police officer's "statement that [defendant] should 'do the right thing,' " constituted interrogation under *Innis*]);

—told Z.A. that she knew "a lot more than what [she was] telling [him]" (see *In re Albert R.* (1980) 112 Cal.App.3d 783, 792 [169 Cal.Rptr. 553] [officer's use of "accusatory language" constituted functional equivalent of express interrogation]);

—confronted Z.A. with evidence against her by stating, "[Adkisson] told [Agent Cramer] the truth" (see *People v. Davis* (2005) 36 Cal.4th 510, 555 [31 Cal.Rptr.3d 96, 115 P.3d 417] [police officer engaged in interrogation by

---

[15] Agent Cramer testified at the adjudication hearing that he was aware that Z.A. had no prior criminal history at the time he interviewed her.

implying that police had found fingerprint evidence on gun involved in shooting]; *Sims, supra*, 5 Cal.4th at p. 443 [officer engaged in functional equivalent of interrogation by "confronting defendant with the evidence linking him to the crimes"]);

—told Z.A. that she should be "cooperating" and that it looked like she was "hiding a lot," which would not look good in his written report to the judge (see *U.S. v. Montana* (2d Cir. 1992) 958 F.2d 516, 518 [officer's statement "informing the defendants that any cooperation would be brought to the attention of the Assistant United States Attorney constituted 'interrogation' "]); and

—made specific requests for information by stating, ". . . I need you to tell me what [Adkisson] told you" (see *Innis, supra*, 446 U.S. at p. 301 [interrogation includes "express questioning"]). It is clear that Agent Cramer's statements, "taken collectively, fall within the scope of questions or conduct reasonably likely to elicit an incriminating response." (*People v. Roquemore* (2005) 131 Cal.App.4th 11, 26 [31 Cal.Rptr.3d 214].)

█ In sum, after Z.A. invoked her right to remain silent, the officers failed to "scrupulously honor[]" that invocation, and instead, intensified their interrogation of Z.A. (*Mosley, supra*, 423 U.S. at p. 104.) We conclude that the juvenile court should have suppressed all of the statements that Z.A. made after she invoked her right to remain silent.

 4. *The People have not established that the trial court's admission of Z.A.'s statements was harmless beyond a reasonable doubt*

The erroneous admission of statements obtained in violation of *Miranda* is reviewed for prejudice pursuant to *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*). (See, e.g., *People v. Thomas* (2011) 51 Cal.4th 449, 498 [121 Cal.Rptr.3d 521, 247 P.3d 886]; *People v. Peracchi* (2001) 86 Cal.App.4th 353, 363 [102 Cal.Rptr.2d 921].) Under *Chapman*, reversal is required unless the People establish that the court's error was "harmless beyond a reasonable doubt." (*Chapman, supra*, 386 U.S. at p. 24.)

█ Transporting more than 28.5 grams of marijuana (§ 11360, subd. (a)) (counts 1, 2), and possessing marijuana for sale (§ 11359) (count 3) both require proof that the defendant have knowledge of the presence of the marijuana. (See *People v. Busch* (2010) 187 Cal.App.4th 150, 156 [113 Cal.Rptr.3d 683] [stating elements of transporting marijuana under § 11360]; *People v. Harris* (2000) 83 Cal.App.4th 371, 374 [99 Cal.Rptr.2d 618] [stating elements of possessing marijuana for sale under § 11359].)

■ In arguing that the admission of Z.A.'s highly inculpatory statements in which she admitted having participated in a plan to smuggle drugs across the border was harmless beyond a reasonable doubt, the People contend that there was "ample [other] evidence from which the juvenile court could infer that appellant was aware of the drugs and possessed them for sale." In support of this contention, the People cite two pieces of evidence. First, the People refer to evidence pertaining to "[Z.A.'s] conduct during the initial stop at the border check point." The People note that Officer Ibarra testified that when he initially contacted Z.A. at the border, she appeared "nervous." Officer Ibarra explained, "[S]he wouldn't look at me," and stated that Z.A. was "intensely looking at her [handheld video] game." This testimony is plainly insufficient to establish the knowledge element of the charged offenses. (See *People v. Evans* (2011) 200 Cal.App.4th 735, 754 [133 Cal.Rptr.3d 323] [" 'Mere nervous, furtive, or evasive conduct in the presence of police will not justify a *detention*.' " (italics added).)[16] It necessarily follows that such testimony does not demonstrate that the admission of Z.A.'s inculpatory statements obtained in violation of *Miranda* was harmless beyond a reasonable doubt.

The People also claim that "the statements [Z.A.] made during the interview, prior to stating she did not want to answer any more questions," rendered the admission of her postinvocation statements harmless beyond a reasonable doubt. We disagree. While some of Z.A.'s preinvocation statements might be viewed as marginally inculpatory, at no time prior to her invocation had Z.A. indicated that she knew there were drugs in the car in which she was a passenger. At trial, Agent Cramer agreed with defense counsel that, prior to her invocation of the right to remain silent, Z.A. had not said "anything about what she personally knew that day."

In contrast, after her invocation, the officers obtained highly inculpatory statements from Z.A. in which she indicated that she was a full participant in the transportation of the drugs on the day in question. Specifically, Agent Cramer testified at the adjudication hearing that after Z.A. had invoked her right to remain silent, in response to his comments, Z.A. "changed [her story]" and stated "that she *did* know that there were drugs in the vehicle." (Italics added.) In addition, Agent Cramer testified that Z.A. told the officers that she "thought that this was the first time there was narcotics in the vehicle." Z.A. said that Adkisson had told her not to be nervous and that the dogs would not detect the drugs. Z.A. also indicated that she believed Adkisson was going to be paid $1,000 for crossing the car, that she had been with Adkisson when an unknown man brought him the car to drive across the

---

[16] Officer Ibarra conceded that a passenger attempting to cross the border might appear nervous "for any number of reasons."

border, and that a white truck had followed Adkisson and Z.A. as they approached the border in the car.

Further, there is scant evidence in the record, apart from Z.A.'s statements, that demonstrates that Z.A. knew there were drugs in the Eclipse. In addition, the juvenile court expressly relied on Z.A.'s postinvocation statements in sustaining the petition, finding that the statements "clearly" established "[Z.A.'s] knowledge of what was going to happen." In sum, the improperly admitted statements were highly inculpatory, and the juvenile court expressly relied on them in sustaining the petition, while the remainder of the evidence in the record as to Z.A.'s knowledge of the presence of the drugs was marginal, at best. Under these circumstances, we conclude that the People have not established that the *Miranda* error was harmless beyond a reasonable doubt.[17]

B. *There is sufficient evidence to support the juvenile court's true findings that Z.A. knowingly transported marijuana and possessed marijuana for sale*

Z.A. contends that there is insufficient evidence to support the juvenile court's true findings that she transported more than 28.5 grams of marijuana (§ 11360, subd. (a)) (counts 1, 2) and possessed marijuana for sale (§ 11359) (count 3).

1. *The law governing sufficiency claims*

The law regarding appellate review of claims challenging the sufficiency of the evidence in the juvenile context is the same as that governing review of sufficiency claims generally. (*In re Roderick P.* (1972) 7 Cal.3d 801, 809 [103 Cal.Rptr. 425, 500 P.2d 1].) In determining the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that

---

[17] The People have not argued that the statements in question would have been admissible to impeach Z.A., and we therefore do not address that issue. (But see *People v. Bradford* (2008) 169 Cal.App.4th 843, 855 [86 Cal.Rptr.3d 866] ["Whether defendant would have testified in the absence of the need to respond to his confession and, if so, whether the confession would have been admitted for purposes of impeachment requires us to engage in speculation about the parties' tactical choices. Because it is impossible to determine what might have happened had the trial proceeded differently, we conclude that prejudice should be evaluated on the basis of the evidence actually presented, while excluding the improperly admitted confession."].)

is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

In considering a sufficiency claim, "the reviewing court must consider *all* of the evidence presented at trial, including evidence *that should not have been admitted.*" (*People v. Story* (2009) 45 Cal.4th 1282, 1296 [91 Cal.Rptr.3d 709, 204 P.3d 306], second italics added (*Story*).) The *Story* court explained that it is well established that a reviewing court must consider even improperly admitted evidence in determining whether there is sufficient evidence to support a trier of fact's finding of guilt: " '[W]here the evidence offered by the State and admitted by the trial court—whether erroneously or not—would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial.' (*Lockhart v. Nelson* (1988) 488 U.S. 33, 34 [102 L.Ed.2d 265, 109 S.Ct. 285].) Accordingly, 'a reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause . . . . ' (*Id.* at p. 41.) We have followed the high court in this regard. [Citations.]" (*Story, supra,* at pp. 1296–1297.)

### 2. *Application*

#### a. *There is sufficient evidence to support Z.A.'s conviction for transporting more than 28.5 grams of marijuana*

■ "[T]he elements of the offense of transportation of marijuana are (1) a person transported, that is, concealed, conveyed or carried marijuana, and (2) the person knew of its presence and illegal character." (*People v. Busch, supra,* 187 Cal.App.4th at p. 156.) ■ A person may be guilty of a crime either as a direct perpetrator or as an aider and abettor. (See Pen. Code, § 31; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117 [108 Cal.Rptr.2d 188, 24 P.3d 1210] ["a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts"].) " 'A person aids and abets the commission of a crime when he . . . (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 851 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

Z.A. contends that there is insufficient evidence that she *transported* marijuana. (Citing *People v. Emmal* (1998) 68 Cal.App.4th 1313, 1318 [80 Cal.Rptr.2d 907] [for purposes of establishing the transportation element

contained in § 11379 (transporting methamphetamine) "the evidence need only show that the vehicle was moved while under the defendant's control"].) We disagree. The People presented evidence that Z.A. went with Adkisson to pick up the car in which the marijuana was hidden, that she knew there were drugs in the car, and that she agreed to attempt to cross the border in the car knowing of the presence of drugs. By presenting evidence that Z.A. was a full participant in the transportation of the drugs on the day in question, the People presented sufficient evidence from which a reasonable fact finder could find that Z.A. assisted Adkisson in the transportation of marijuana, and that she was thereby guilty of violating section 11360, pursuant to an aiding and abetting theory. (See *People v. Meza* (1995) 38 Cal.App.4th 1741, 1746 [45 Cal.Rptr.2d 844] [concluding record contained sufficient evidence of defendant's guilt for transporting cocaine for sale where trier of fact could infer that passenger in vehicle containing drugs "went along to assist [driver]"].)

Z.A. also contends that there is insufficient evidence that she knew there was marijuana hidden in the car. Z.A.'s only argument in this regard is that the statements that she made that demonstrate her knowledge were improperly admitted. However, even if the statements were improperly admitted, we must consider them in determining Z.A.'s sufficiency claim. (*Story, supra,* 45 Cal.4th at p. 1296.) As noted above, Z.A. made a number of highly inculpatory statements to Agent Cramer from which a reasonable fact finder could find that she knew there was marijuana hidden in the car and that she was aware of its illegal character. We therefore reject Z.A.'s contention that there is insufficient evidence of the knowledge element of section 11360.

Finally, Z.A. contends that she may not stand convicted of more than one count of transporting more than 28.5 grams of marijuana (§ 11360, subd. (a)) (counts 1, 2). Although styled by Z.A. as a "sufficiency" claim, as the People correctly note, the contention is actually one premised on the bar against multiple convictions of the same offense based on a single act contained in Penal Code section 954. (See *People v. Coyle* (2009) 178 Cal.App.4th 209, 217 [100 Cal.Rptr.3d 245] (*Coyle*) [defendant may not be convicted of multiple counts of same offense for same act under Pen. Code, § 954].) The People concede that while the prosecution may pursue alternatively *pled* theories of Z.A.'s violation of section 11360,[18] Z.A. may not stand *convicted* of more than one offense. (See *Coyle, supra,* at p. 217.) In light of our reversal of all the true findings on all counts, the People's concession is moot.

---

[18] Section 11360, subdivision (a) states that any person who "transports, imports into this state, sells, furnishes, administers, or gives away, or offers to transport, import into this state, sell, furnish, administer, or give away, or attempts to import into this state or transport any marijuana" is guilty of a felony. The People argue that counts 1 and 2 represented alternative theories by which the People alleged that Z.A. violated the statute.

However, because Z.A.'s claim in this regard is not a sufficiency claim, retrial is not barred on either count 1 or 2 on remand.

b. *There is sufficient evidence to support Z.A.'s conviction for possessing marijuana for sale*

■ " 'Unlawful possession of a controlled substance for sale requires proof the defendant possessed the contraband with the intent of selling it and with knowledge of both its presence and illegal character. [Citation.]' [Citations.]" (*People v. Harris, supra*, 83 Cal.App.4th at p. 374.) "It is well established that one may become criminally liable for possession for sale or for transportation of a controlled substance, based upon either actual or constructive possession of the substance. [Citation.] Constructive possession exists where a defendant maintains some control or right to control contraband that is in the actual possession of another. [Citation.]" (*People v. Morante* (1999) 20 Cal.4th 403, 417 [84 Cal.Rptr.2d 665, 975 P.2d 1071].)

Z.A. contends that there is insufficient evidence that she had either actual or constructive possession of the marijuana. We disagree. By presenting evidence that Z.A. participated in a drug-smuggling operation (see pt. III.B.2.a., *ante*), the People presented sufficient evidence from which a reasonable fact finder could find that Z.A. exercised, at a minimum, constructive possession of the marijuana. (See *People v. Meza, supra*, 38 Cal.App.4th at p. 1746 [concluding record contained sufficient evidence that passenger in car was guilty of possessing cocaine for sale hidden in car].) The cases on which Z.A. relies in her brief, *U.S. v. Sanchez-Mata* (9th Cir. 1991) 925 F.2d 1166, 1169, and *People v. Jenkins* (1979) 91 Cal.App.3d 579, 582 [154 Cal.Rptr. 309], are distinguishable because in neither of those cases did the People present evidence that the defendant was a participant in the criminal activity at issue. In this case, in contrast, by presenting evidence that Z.A. assisted in picking up the car in which the marijuana was hidden and that she agreed to accompany Adkisson in transporting those drugs, the People presented sufficient evidence that Z.A. participated in the drug-smuggling operation, and that she constructively possessed the hidden marijuana.

Z.A. also contends that there is insufficient evidence that she had knowledge of the marijuana because the only evidence of this element was derived from her improperly admitted statements. We reject Z.A.'s argument because, as noted above, we must consider even improperly admitted evidence in evaluating a sufficiency claim. (*Story, supra*, 45 Cal.4th at p. 1296.)[19]

---

[19] We emphasize that we express no opinion as to whether there would be sufficient evidence to support true findings on any of the charged offenses without consideration of Z.A.'s inadmissible statements.

## IV.

## DISPOSITION

The judgment is reversed.

Benke, Acting P. J., and McIntyre, J., concurred.