Filed 10/31/13  P. v. Romo CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JAVIER ROMO et al.,<br><br>  Defendants and Appellants. | D061794<br><br><br><br>(Super. Ct. Nos. JCF27332;<br>                    JCF27641) |

APPEALS from judgments of the Superior Court of Imperial County, Juan Ulloa, Judge.  Affirmed.

John E. Edwards, under appointment by the Court of Appeal, for Defendant and Appellant Javier Romo.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant Luis Scott.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Javier Romo (a minor tried as an adult) and Luis Scott (together defendants) guilty of the attempted murder of Antonio Meza (Pen. Code, §§ 187, subd. (a) & 664). Defendants brought a new trial motion claiming juror misconduct and bias. The court denied the motion and sentenced Romo and Scott each to the middle prison term of seven years.

Defendants raise two contentions. First, Romo contends the court committed reversible error when it denied his motion to suppress evidence of a statement he made to police during custodial questioning after he was properly given a *Miranda*[1] warning and the interrogating detective continued to question him after he said, "I wanna remain silence [*sic*]." Second, defendants contend the court erred in denying their motion for a new trial, in which they claimed Juror No. 1 knew and concealed the fact that Scott's trial counsel, Steven Honse, was a partner in the law firm that was then representing Juror No. 1's former husband in a child custody and child support modification proceeding. We affirm defendants' convictions.

FACTUAL BACKGROUND

A. *The People's Case*

At around 10:30 p.m. on Sunday, May 29, 2011, Antonio Meza left his home in El Centro and started walking to his girlfriend Blanca Medina's house. As he walked past a park, Meza saw a group of people gathered nearby to his left. He also saw a small white car stop briefly near the group and then drive away. As Meza continued walking,

---

1    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

the group of people started running towards him and five young Hispanic males surrounded him.

Meza testified that Romo stood "[r]ight in front of me" while the rest of the group circled around Meza. Although Meza recognized Romo because he had seen him around the neighborhood and had spoken to him a few times, Meza only knew him by his nickname, "Pistol."

In an angry and threatening manner, Romo said, "What's up," and asked Meza whether he had anything on him. After Meza replied that he did not have anything on him, someone behind him stabbed him and struck him in the back of the head and neck. Meza fell to the ground, got back up on his feet after the group kicked and hit him, and then started running.

As he was running, Meza looked over his left shoulder and saw someone, whom he later identified as Scott, who chased him and hit him from behind. Scott was the only one who was chasing Meza. Meza knew Scott by his nickname "Vago." Meza was able to identify Scott when Meza looked over his shoulder because there was a street light there. Meza did not know what he was hit with.

Meza kept running and Romo, Scott and the rest of the group drove off in the same white car Meza had seen earlier. Meza saw Romo sitting in the passenger seat as the car drove away. Meza was about 10 feet away from the car when it drove by.

Meza continued walking and felt blood going down his back. He felt dizzy, his vision was blurry, and he had difficulty breathing. He had to stop several times to rest.

3

Meza eventually reached Medina's house. When Meza went inside to her bedroom, she saw blood on the back of his sweater and sweatpants. Medina cut off his sweater and saw he had five stab wounds. She cleaned his wounds with hydrogen peroxide and used feminine pads to stop the bleeding. Medina asked Meza who had done that to him, and he said he was stabbed by a group. Meza told her two men whom he knew as "Vago" (Scott) and "Konex"[2] were there.

Medina showed Meza a photograph of a group of five males,[3] one of whom—at the far right—was Romo. She asked Meza if he recognized anyone in the picture. Meza pointed out Romo and another person whose name he did not know. Meza believed all five of the males in the photograph belonged to the same group. Later, after Meza started having convulsions, Medina's mother called 911.

Officers arrived on the scene and spoke with Meza, who told them that members of a group in the neighborhood had attacked him.

Meza was then hospitalized. He was in critical condition. He had suffered multiple stab wounds on his back, two on the left side of his chest and two on the right side, and had a collapsed lung. He was given a sedative medication called Versed, which can affect a patient's memory.

---

[2] Medina testified that Konex was the nickname that Jose Cordova used. Cordova, whom Meza identified as one of his attackers, is not a party to this appeal.

[3] The prosecution introduced the photograph as exhibit 10.

An officer investigating the stabbing spoke to Meza in the hospital. Meza identified Vago (Scott), a person he knew as Tiny,[4] and Konex (Cordova, see fn. 2, *ante*) as three of his attackers.

Another officer, Detective Alfredo Hernandez, later interviewed Meza several times about the stabbing. Meza identified Romo out of a six-pack photographic lineup as one of the attackers. Meza also identified Konex and Tiny as attackers. During the first interview, Meza told Detective Hernandez that Romo stood next to Tiny during the attack.

B. *The Defense*

Romo's friend Enrique Jimenez, who was one of the five males shown in the photograph marked as exhibit 10 (discussed, *ante*), testified that on May 29, 2011, the night of the stabbing, Romo was with him at Jimenez's grandmother's house in El Centro for a barbeque dinner. Jimenez stated he was there with Romo from 5:30 p.m. to around 11:30 p.m. Jimenez's mother and grandmother also testified that Romo was with them at the barbeque at the time of the stabbing.

Romo also called an expert witness who testified about memory recall and suggestibility.

C. *Prosecution's Rebuttal Evidence*

In response to the defense's three alibi witnesses, the People recalled Detective Hernandez, who again testified about his interview with Romo. In the interview, after

---

4      Tiny was the nickname used by Martin Andrade, who, like Cordova, is not a party to this appeal.

5

Detective Hernandez read him his *Miranda* rights and Romo said he understood those rights. Romo indicated that on the night of the stabbing he was in Mexicali at a baptism with his mother. A recording of that portion of the interview was played for the jury.

DISCUSSION

I. *MIRANDA*

Romo first claims the court committed reversible error when it denied his motion to suppress evidence of a statement he made to police during custodial questioning after he was properly given a *Miranda* warning. Specifically, he claims that Detective Hernandez violated his *Miranda* rights by continuing to question him after he invoked his right to remain silent by telling the detective, "I wanna remain silence [*sic*]," and that the court erred by denying his in limine motion to suppress his statement that on the night of the stabbing he was attending a baptism in Mexicali with his mother. This contention is unavailing.

A. *Background*

Romo brought a motion in limine to exclude evidence of statements he made during police questioning following his arrest, claiming that Detective Hernandez violated his *Miranda* rights by continuing to interrogate him after he invoked his right to remain silent. The People opposed the suppression motion, arguing that Romo's ambiguous statement did not constitute an invocation of his right to remain silent and that Romo impliedly waived that right. In support of their opposition, the People submitted a transcript of the interview, which the court considered.

6

1. *Interview transcript*

The transcript shows, and Romo does not dispute, that Detective Hernandez properly read him his *Miranda* rights. The following pertinent exchange between Detective Hernandez and Romo occurred soon thereafter:

"[Detective Hernandez]: Do you want to talk about what happened?

"[Romo]: Well, I don't know what happened . . . I just, uh . . . well, I don't know what happened, but I don't got nothin' to say about, um . . . .

"[Detective Hernandez]: Well, it's . . . it's, um . . . you can't have it both ways, bro.

"[Romo]: I don't know what happened, um . . . I don't know. [VOICES OVERLAPPING]

"[Detective Hernandez]: Do you want to tell your side of the story?

"[Romo]: What side of the story? [CHUCKLE] . . . [U]h, I don't get what you're talking about[.] [W]hat side of the story?

"[Detective Hernandez]: All right . . . [SIGHS] . . . this is an area that we gotta be kinda careful on, okay? [C]uz *you're not telling me that you want to talk about it, but then again, you're not telling me that you want to remain silent* . . . and so you [VOICES OVERLAPPING] . . . you . . . you . . . [VOICES OVERLAPPING]

"[Romo]: No, well, *I wanna remain silence* [*sic*], but . . . what I mean is, well, I wanna know what's . . . what . . . why you're bringing me in and taking me to the hall . . . you know what I mean? [VOICES OVERLAPPING]

"[Detective Hernandez]: Well, there was a stabbing . . . .

"[Romo]: Oh, yeah?

"[Detective Hernandez]: . . . um [VOICES OVERLAPPING]

"[Romo]: Well, I don't know . . . .

7

"[Detective Hernandez]:   . . . on Sunday night.

"[Romo]:   . . . well, I don't know nothin' about that stabbing.

"[Detective Hernandez]:  Okay . . . I got some questions for you . . . .

"[Romo]:  Well, I don't know.

"[Detective Hernandez]:  [Y]ou want to hear me out?  [O]r do you want to talk about . . . .

"[Romo]:  Well, I don't got nothin' . . . I can't answer your questions when I . . . I wasn't there, so I don't know . . . I don't know how you wanna do it [VOICES OVERLAPPING]  [¶] . . . [¶]

"[Detective Hernandez]:  We can get started and there's [*sic*] some things that you don't want to talk about or you don't want to say, just say so . . . .

"[Romo]:  No, but [VOICES OVERLAPPING]

"[Detective Hernandez]:   . . . not gonna trick you [VOICES OVERLAPPING]

"[Romo]:   . . . um . . . I mean, like . . . you know, I wasn't there, so I can't talk, you know what I mean? for that . . . for that incident . . . so, how do you wanna talk about that?, you know.

"[Detective Hernandez]:  Well, there was a stabbing . . . [voices overlapping] and the victim is saying that he saw you come up to him.

"[Romo]:  Oh, yeah?

"[Detective Hernandez]:  Uh-huh.

"[Romo]:  Oh, well . . . .

"[Detective Hernandez]:  Is there anything about that, that . . . .

"[Romo]:  Nah, I don't know . . . I wasn't even [VOICES OVERLAPPING]

8

"[Detective Hernandez]:  . . . you weren't there?

"[Romo]:  I wasn't even there.

"[Detective Hernandez]:  Um . . . what did you do on Sunday night? [¶] . . . [¶]

"[Romo]:  [T]his Sunday?

"[Detective Hernandez]:  Last Sunday.

"[Romo]:  Oh, last Sunday?  I left [VOICES OVERLAPPING]

"[Detective Hernandez]:  T]he [30th] was, um, Memorial Day.

"[Romo]:  *Oh, the day before I left to go over here, MEXICALI*.

"[Detective Hernandez]:  With who [*sic*]?

"[Romo]:  *With my mom*.  [¶] . . . [¶]

"[Detective Hernandez]:  Was it . . . like a birthday party or was it [VOICES OVERLAPPING]

"[Romo]:  Nah, [*it was a baptism*.]"  (Italics added.)

2. *Hearing and ruling*

At the hearing on Romo's suppression motion, during direct examination by Romo's counsel, Detective Hernandez acknowledged that Romo told him he wanted to remain silent, but stated that Romo wanted to know what he knew, and he (Detective Hernandez) "took it as he wanted to talk."  On cross-examination, Detective Hernandez testified he had interacted with, and questioned, Romo "numerous times" in the past and during this interview Romo was "pretty relaxed," he did not seem nervous, and he was told the interview was being audio-recorded.  Detective Hernandez indicated he believed

9

Romo understood his *Miranda* rights and waived those rights by continuing to speak with him.

1. *Ruling*

The court noted that after Romo indicated he understood his right to remain silent and Detective Hernandez asked him whether he wished to talk, Romo said, "I don't know what happened." Viewing this statement in context, the court observed, "I think a fair inference says, 'I want to tell you but I don't know what happened.' That means I'll answer the question in a negative way, in an exculpatory way." The court interpreted Romo's statements to Detective Hernandez to mean, "Well, I want to remain silent but I want to know what's going on."

The court also noted that Detective Hernandez was not "provoking or engaging in [Romo's] continuing to speak," and Romo "[did not] unambiguously say he [did not] want to speak." "What he says is he knows nothing about it "

The court denied Romo's suppression motion, finding that Romo's *Miranda* rights were not violated because Romo knew and understood his right to remain silent, he continued to speak to Detective Hernandez and deny involvement in the stabbing, and, thus, his actions constituted an implied waiver of his right to remain silent.

B. *Applicable Legal Principles*

In *People v. Williams* (2010) 49 Cal.4th 405 (*Williams*), the California Supreme Court summarized the general law governing *Miranda* claims: "The [United States Supreme Court] has stated in summary that to counteract the coercive pressure inherent in custodial surroundings, '*Miranda* announced that police officers must warn a suspect

10

prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. [Citation.] After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. [Citation.] Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. [Citation.] Critically, however, a suspect can waive these rights. [Citation.] To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the "high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst* [(1938)] 304 U.S. 458." ' [Citation.] [¶] 'The prosecution bears the burden of demonstrating the validity of the defendant's waiver by a preponderance of the evidence.' [Citations.] In addition, '[a]lthough there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was [voluntary,] knowing[,] and intelligent under the totality of the circumstances surrounding the interrogation.' " (*Id*. at p. 425.)

In *People v. Wash* (1993) 6 Cal.4th 215, 238, our high state court explained that, "[o]nce [*Miranda*] warnings have been given, '[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.' [Citation.] Once such a request is made, it must be 'scrupulously honored' [citation]; the police may not attempt to circumvent the suspect's decision 'by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.' "

11

In *Berghuis v. Thompkins* (2010) 560 U.S. 370 (*Berghuis*), the United States Supreme Court clarified that a *Miranda* waiver need not be formal or express, but rather may be implied from all the circumstances.  (*Id.* at p. 2261.)

The *Berghuis* court also addressed the standards to be applied when evaluating whether a defendant has invoked his right to remain silent, thus requiring the interrogation to cease.  *Berghuis* held the accused must make an unambiguous assertion of the right, and if the accused makes an ambiguous or equivocal statement or makes no statement, the police are not required to end the interrogation or ask clarifying questions.  (*Berghuis v. Thompkins*, *supra*, 560 U.S. 370 at pp. 2259-2260.)  *Berghuis* reasoned: "A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity.  [Citation.]  If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'"  (*Id.* at p. 2260.)  The court also explained that suppression of a voluntary confession in the face of an ambiguous or equivocal act would place a significant burden on society's interest in prosecuting criminal activity, and " 'full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.' "  (*Ibid*.)

"Statements obtained in violation of *Miranda* are inadmissible to establish guilt." (*People v. Sims* (1993) 5 Cal.4th 405, 440.)

12

1. *Standard of review*

"On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence." (*People v. Williams*, *supra*, 49 Cal.4th at p. 425.)

"The erroneous admission of statements obtained in violation of *Miranda* is reviewed for prejudice pursuant to *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). [Citations.] Under *Chapman*, reversal is required unless the People establish that the court's error was 'harmless beyond a reasonable doubt.'" (*In re Z.A.* (2012) 207 Cal.App.4th 1401, 1422.)

C. *Analysis*

Romo asserts that "[t]his case is on all fours with and is controlled by this court's recent decision in *In re Z.A.*[, *supra*,] 207 Cal.App.4th [at p.] 1401." We disagree. In that case, the minor and her boyfriend were arrested after a search of their car in the secondary screening area at the San Ysidro port of entry led to the discovery of a package containing marijuana. (*Id*. at pp. 1405-1406.) Immigration and customs agents interviewed the minor after her arrest and informed her of her *Miranda* rights, including her right to remain silent, which she waived; and she began to answer the agents' questions. (*Id.* at pp. 1408-1409.) Thereafter, the minor told the agents, " 'I don't want to answer anymore [*sic*] questions.' " (*Id*. at p. 1410.) Immediately thereafter, the minor said she wanted to know whether her boyfriend " 'is going to stay here how much time.' " (*Ibid*.) The agents responded by intensifying their interrogation of the minor. (*Id*. at

13

p. 1422.)  The juvenile court denied the minor's motion to suppress evidence of statements she made during the interrogation.  (*Id*. at pp. 1412-1413.)

On appeal, this court reversed the judgment, concluding the juvenile court should have suppressed all of the statements the minor made after she invoked her right to remain silent.  (*In re Z.A.*, *supra*, 207 Cal.App.4th at pp. 1422, 1428.)  We explained that the minor had "unambiguously invoked her right to remain silent by expressly stating that she did not want to answer any more questions during the interrogation.  Immediately thereafter, [she] made a statement to the officers *about* [*her boyfriend's*] *custody status*, stating, 'Well, I want to know if [he] is going to stay here how much time.'  Rather than expressing a desire to resume the interrogation, [the minor's] statement is more reasonably interpreted as expressing her interest in knowing whether, and for how long, her boyfriend was to remain detained at the border crossing."  (*Id*. at p. 1420, italics added.)  Citing *Oregon v. Bradshaw* (1983) 462 U.S. 1039, we concluded the minor's inquiry about the custody status of her boyfriend could not reasonably be deemed an invitation to reinitiate a generalized discussion relating to the investigation; rather, it concerned the routine incidents of the custodial relationship.  (*In re Z.A.*, *supra*, at p. 1418.)  We noted that, after the minor's invocation, the agents "did not readmonish [her] concerning her right to remain silent or inquire as to whether she wanted to resume the interrogation."  (*Id*. at p. 1421.)  "In sum," we explained, "after [the minor] invoked her right to remain silent, the officers failed to 'scrupulously honor[]' that invocation, and instead, intensified their interrogation."  (*Id*. at p. 1422.)

14

Here, after Detective Hernandez informed him of his *Miranda* rights and asked him whether he "want[ed] to talk about what happened," Romo said, "No, well, I wanna remain silence [*sic*] . . . ." This statement, viewed in isolation, appears to be an invocation of his right to remain silent. However, immediately after Romo made that statement—and in the same sentence—he, unlike the minor in *In re Z.A.*, initiated a generalized inquiry directly relating both to his *own* custody status and the investigation. Specifically, Romo stated:

> "No, well, I wanna remain silence [*sic*], but . . . what I mean is, well, *I wanna know* what's . . . what . . . *why you're bringing me in and taking me to the hall* . . . you know what I mean?" (Italics added.)

We need not decide whether Romo unambiguously invoked his right to remain silent. For purposes of analysis only, we shall assume that he unambiguously invoked his right to remain silent and that the admission of statements he made after the assumed invocation, including the statement indicating he was in Mexicali with his mother at the time of the stabbing, was erroneous. Thus, the determinative issue we must decide is whether the assumed error was harmless beyond a reasonable doubt. (See *In re Z.A.*, *supra*, 207 Cal.App.4th at p. 1424.)

Romo claims the court's admission of his statements prejudiced him by weakening his alibi defense. Specifically, he asserts "[t]he key to [his] defense . . . was his three alibi witnesses. His friend [Jimenez], [Jimenez's] mother and [Jimenez's] grandmother all testified that at the time [Meza] was assaulted[, he (Romo)] was at a carne asada barbeque at [Jimenez's] grandmother's home [in El Centro]. That alibi witness testimony

15

should have tipped the scales for [Romo], raising significant doubts regarding the eyewitness identification by [Meza]."

However, the record shows, as Romo acknowledges, that the prosecution's case against him turned on Meza's eyewitness identification of Romo as one of his assailants. The jury was tasked with assessing the strength of Meza's identification of Romo, and ample evidence supported the jury's determination that Meza's identification of Romo was credible. Meza testified he knew Romo by his nickname Pistol at the time of the attack, and he recognized Romo because he had seen and interacted with him several times around their neighborhood before the attack. Meza clearly described Romo's role in the attack, telling the jury that Romo stood "[r]ight in front of me," within arm's reach, while the rest of the group circled around him, and Romo said "What's up?" in an angry and threatening manner. Meza testified that someone behind him stabbed him and struck him in the back of the head and neck and he fell to the ground. Meza described for the jury the clothing that Romo was wearing at the time of the stabbing. Meza also testified that, when Romo, Scott, and the rest of the group drove off in the white car after the attack ended, he saw Romo sitting in the passenger seat as the car drove away. Meza told the jury the car was about 10 feet away from him when it drove by, and he was able to see Romo because the passenger seat window, unlike the back windows, was not tinted.

Meza also testified that, after he arrived at Medina's house and told her he had been attacked by a group, she showed him a photograph of a group of five males (which the prosecution introduced as exhibit 10), one of which—at the far right—was Romo.

16

When asked him whether he recognized anyone in the picture Meza pointed out Romo to her.

The prosecution also presented the testimony of Detective Hernandez, who stated he interviewed Meza several times about the stabbing, and, Meza told him during the first interview that Romo stood next to another assailant nicknamed "Tiny" during the attack. Detective Hernandez also testified that Meza identified Romo out of a photographic lineup as one of the attackers.

The totality of the foregoing identification evidence amply established that Romo was one of Meza's attackers. Thus, the fact that the court's admission of Romo's statement—that he was in Mexicali on the night of the stabbing—contradicted and diminished the strength of his alibi defense, was of no moment. For all of the foregoing reasons, we conclude the assumed error was not prejudicial because it was harmless beyond a reasonable doubt.

## II. *NEW TRIAL MOTION*

Defendants contend the court erred in denying their motion for a new trial, in which they claimed Juror No. 1 knew and concealed the fact that Scott's trial counsel, Steven C. Honse, was a partner in the law firm that was then representing Juror No. 1's former husband in a child custody and child support modification proceeding. We conclude the court properly denied defendants' request for an evidentiary hearing and their motion for a new trial.

17

A. *Background*

1. *Juror No. 1's responses during voir dire*

During voir dire in January 2012, the court introduced the prosecutor, defendants, and defendants' counsel—Romo's counsel, John Breeze, and Scott's counsel, Steve Honse—by name to the jury panel. The prosecutor, both defense counsel, and the court addressed the panel of prospective jurors and informed them of the general facts of the case, the nature of the charges, and the names of the expected witnesses.

Shortly thereafter, the court asked the jury panel if anyone knew or had heard of the attorneys, defendants or witnesses. It is undisputed that P.B.—Juror No. 1—did not raise her hand.

Later, during questioning of the prospective jurors, Juror No. 1 stated she was divorced, she had four children, she worked as a correctional counselor for the California Department of Corrections, and she also had worked as a correctional officer. The court asked Juror No. 1 whether she could impartially assess the evidence and witnesses in this case, and she replied, "Absolutely." The court also asked her "Can you think of any reason why you might not be able to be fair?" and she responded, "No, sir."

2. *Defendants' motion for new trial*

Scott filed a motion for a new trial, with supporting declarations, based on alleged misconduct by Juror No. 1. Romo joined in the motion. Defendants' motion alleged Juror No. 1 engaged in misconduct during voir dire by withholding material information that the law firm of Scott's defense counsel was then representing Juror No. 1's former husband in a child custody and child support modification proceeding.

18

The moving papers included a declaration by Honse, who stated that (1) he was appointed in June 2011 to represent Scott; (2) in December 2011, his law firm—Law Offices of Henderson & Honse—was retained by M.L. to represent him in a contested child custody and child support modification proceeding; (3) M.L. told Honse that the name of M.L.'s ex-spouse was P.L., and that name was entered into the firm's conflict database; (4) after the jury returned their verdict convicting Scott on February 2, 2012, Honse's assistant, Melissa Hernandez, advised him that one of the jurors resembled an opposing party in one of the firm's current cases; (5) Honse reviewed the file for M.L., spoke with his law partner, Veronica Henderson, and determined that Juror No. 1 and P.L. were the same person; (6) Honse reported his findings to the prosecutor and advised her he would be filing a motion for new trial and a request for investigative services; (7) numerous attempts were made to interview Juror No. 1, but she refused to provide an interview; (8) on February 23, 2012 (after the trial), Honse appeared in M.L.'s case because his partner Henderson was called to another courtroom; and (9) Honse personally saw and recognized P.L. as juror P.B.

Defendants' new trial motion was also supported by Henderson's declaration and by the declaration of Honse's private investigator who stated that when he attempted to contact Juror No. 1 at her home in March 2012 to serve her with a subpoena, she went into her house and refused to speak with him.

Also attached to the motion were copies of several documents that Juror No. 1's ex-spouse, M.L., served on her attorney at the Marcus Family Law Center in the family law court proceeding. Included in these exhibits was a November 2011 substitution of

19

attorney indicating that Honse's partner, Henderson, had become the attorney of record for M.L., who had been representing himself in propria persona. Although the heading on the rest of the documents listed the name of the law firm (Law Office of Henderson & Honse), Henderson's name (Veronica A. Henderson), and Honse's name (Steven C. Honse) in that order, the heading on the substitution of attorney listed Henderson's and the law firm's names, but did not separately list Honse's name.

In their opposition, the People argued that defendants had presented no evidence showing that Juror No. 1 intentionally or unintentionally concealed information and stated that she "may not have known that [Honse] represented her husband in their family law matter until he appeared in family law court on February 23[, 2012], about three weeks after the verdict in this case." The People also argued that the new trial motion was based on alleged misconduct that did not apply to Romo.

a. *Hearing and ruling*

The court conducted a hearing on the new trial motion during the sentencing proceeding. Honse stated he was "pretty much" submitting on the moving papers, but argued that after the trial concluded in this matter, he discovered that his office was representing Juror No. 1's ex-husband in a custody dispute that involved her, and the hearing in the custody case took place a couple of weeks after Juror No. 1 and the other jurors rendered their verdict. He stated that as Juror No. 1 "sat there on the jury," she "had a pending [hearing] date with me" and every document in the custody case listed his name at the top. He asserted he thought it was "inconceivable that she didn't know, and

20

then when the court asked her whether or not she knew any of the attorneys, I think that she was disingenuous when she said that she did not."

Romo's counsel argued the evidence presented in support of the new trial motion evidence established a prima facie case of misconduct that gave rise to a presumption of prejudice, and requested that the court conduct an evidentiary hearing to determine whether Juror No. 1 "recognized [Honse] as the attorney that was representing he ex-husband."

The prosecutor argued the motion should be denied because defendants had failed to show that Juror No. 1 intentionally or unintentionally concealed information. The prosecutor pointed out that it was Honse's law firm partner Henderson, not Honse, who was the attorney of record in Juror No. 1's custody case, as shown by the copy of the substitution of attorney submitted with the new trial motion papers. The prosecutor also pointed out that Honse stated in his declaration that the only time he personally appeared in the child custody case was three weeks after the verdict, and that, "if Juror No. 1 saw him at that hearing, it was after the verdict." The prosecutor also argued it was "mere speculation and conjecture and hope that [Juror No. 1] should have known, which is not the standard."

a. *Ruling*

The court denied defendants' motion for a new trial. In its ruling, the court noted that "[t]here is no evidence that [Honse] physically personally appeared or had any personal interaction with [Juror No. 1]. There's evidence that [Juror No. 1] affirmed under penalty of perjury, she took an oath that she did not know him or knew of him."

21

The court observed that "[t]he fact that counsel's name appears on a pleading is not addressed by any evidence that the juror really recognized or had heard of him." The court also stated, "[W]hile we can speculate as to what [Juror No. 1] should have known, or might have known, we might infer also that [Honse] should have known, might have known, could have discovered." Finding the defendants had failed to meet their burden of proof, the court stated there was "no basis to infer that a party in a civil matter, no matter how highly contested, should know that the person whose name appears at the top of the papers, but is not the attorney of record, is not the person appearing in court when a matter is in court, and is not signing the documents or the papers should know that there is a relationship between those matters and the matter before the court with which she has no involvement of any kind."

The court also denied the defendants' request for an evidentiary hearing "because of the failure of [the] burden of proof, and because of the lack of materiality through the alleged concealment or failure to disclose or misconduct." The court found that Juror No. 1's exercising her right not to discuss to case with defense counsel "cannot be the evidence of . . . bias" in light of its instruction to the jury, counsel, and counsel's agents "not to have contact with her without her consent for a reasonable time."

B. *Applicable Legal Principles*

In *People v. Cissna* (2010) 182 Cal.App.4th 1105, this court explained that "[a] defendant has a constitutional right to a trial by an impartial jury. [Citation.] An impartial jury is one in which no member has been improperly influenced and every member is capable and willing to decide the case solely on the evidence before it. To

22

effectuate this right, the prospective jurors are subjected to voir dire questioning under oath to uncover any bias, and the selected jurors are sworn to decide the case based on the evidence presented to them and the instructions given by the court." (*Id*. at p. 1115.)

"A juror who conceals relevant facts or gives false answers during the voir dire examination . . . undermines the jury selection process and commits misconduct." (*In re Hitchings* (1993) 6 Cal.4th 97, 111 (*Hitchings*).)

" '[J]uror misconduct involving the concealment of material information on voir dire raises the presumption of prejudice.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1208, quoting *Hitchings*, *supra*, 6 Cal.4th at p. 119.) Although juror misconduct raises a presumption of prejudice, "[a]ny presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*In re Hamilton* (1999) 20 Cal.4th 273, 296.)

Where the admissible evidence raises a strong possibility that misconduct has occurred, the trial court has discretion to determine whether to conduct an evidentiary hearing to resolve factual disputes raised by the claim of juror misconduct. (*People v. Avila* (2006) 38 Cal.4th 491, 604.) A defendant is not entitled to an evidentiary hearing "as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is 'necessary to resolve material, disputed issues of fact.' [Citation.] 'The hearing . . . should be held only when the defense has come forward with evidence

23

demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' " (*Ibid.*)

1. *Standard of review*

On appeal from a ruling denying a new trial motion based on juror misconduct, we accept the trial court's credibility determinations and factual findings if supported by substantial evidence, and exercise our independent judgment on the issue of whether prejudice arose from the misconduct (i.e., whether there is a substantial likelihood of juror bias). (*People v. Nesler* (1997) 16 Cal.4th 561, 582 & fn. 5; see *People v. Ault* (2004) 33 Cal.4th 1250, 1263-1264.)

"We review for abuse of discretion the trial court's denial of defendant's postverdict request for an evidentiary hearing into allegations of jury misconduct." (*People v. Carter* (2003) 30 Cal.4th 1166, 1216.)

C. *Analysis*

Defendants claim the court erred in denying their new trial motion because the declarations of his trial counsel Honse, Honse's assistant, and his private investigator, filed in support of the motion, established that Juror No. 1 committed prejudicial misconduct by concealing her knowledge during voir dire and the subsequent trial proceedings in this matter that Honse's law firm at that time represented Juror No. 1's

24

former husband in a contested child custody and support modification proceeding in family court.[5]

Having reviewed the record, we conclude the court did not err in denying defendants' new trial motion because, as the court properly found, defendants failed to meet their burden of proving Juror No. 1 engaged in misconduct, and there was no evidence showing a substantial likelihood that Juror No. 1 was actually biased against either Scott or Romo.

"[A]n honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias." (*In re Hamilton*, *supra*, 20 Cal.4th at p. 300.)

Here, the only reasonable inference that may be drawn from the record is that Juror No. 1 at most committed an honest mistake when, by failing to raise her hand during voir dire, she indicated she did not know Honse. As the Attorney General points out, Scott's claim that Juror No. 1 concealed that she knew Honse represented her former husband in the family court matter rested on evidence that she was served with various court documents in the family court case and that Honse's name was listed at the top of the title pages of those papers along with the name of his law firm and his law partner. Specifically, Scott asserted in his memorandum of points and authorities that, "[a]t the time [Juror No. 1] stated she did not know [Honse], she had a pending hearing where

---

5    In his one-paragraph joinder in Scott's arguments on appeal regarding this issue, Romo asserts that any prejudice to Scott "certainly spilled over" and also affected him (Romo).

25

[Honse] represented her ex-husband as well as a series of pleadings, letters, and other materials where [Honse's] name was repeatedly displayed on every title page." During his oral argument at the hearing on the new trial motion, Honse repeated this claim, stating that "every moving paper has my name at the top of the sheet."

In fact, as already noted, one of the documents filed in the family court case was a substitution of attorney—a copy of which Honse submitted in support of Scott's new trial motion—filed in November 2011 before Juror No. 1 was questioned during voir dire in this case in January 2012, indicating that Honse's partner, Henderson, had become the attorney of record for Juror No. 1's former husband (M.L.), who had been representing himself in propria persona. Although the headings on the rest of the family court documents listed the name of the law firm, the name of Honse's partner Henderson, and Honse's name in that order, the heading of the substitution of attorney listed the law firm's and Henderson's names, but did *not* separately list Honse's name. Thus, the uncontested evidence in the record shows that Henderson, *not Honse*, was the attorney of record in the family court case.

It is also undisputed, as Honse acknowledged in his declaration in support of the new trial motion, that he did not make a personal appearance in the family court proceedings until February 23, 2012, about three weeks *after* the jury returned its guilty verdict against Scott on February 2 of that year.

26

Thus, the reasonable inference to be drawn from these undisputed facts is that, at the time of voir dire and throughout the trial in this case, Juror No. 1 had not seen Honse at any of the family court hearings and would not have recognized him as part of her former husband's legal team. Her former husband had represented himself before the substitution of attorney was filed in November 2011 before voir dire commenced in January 2012, and between November 2011 and February 23, 2012—when Honse made his first physical appearance in family court three weeks *after* the February 2, 2012 verdicts in this case—Honse's partner had made the appearances on behalf of Juror No. 1's former husband in that court. Scott failed to meet his burden of presenting evidence supporting a reasonable inference that Juror No. 1 did not commit an honest mistake. He presented no evidence that would support a reasonable inference that Juror No. 1 was actually biased against him or Romo. (See *In re Hamilton*, *supra*, 20 Cal.4th at pp. 296, 300.) For the foregoing reasons, we conclude the court properly denied defendants' request for an evidentiary hearing and their motion for a new trial.

DISPOSITION

The judgments are affirmed.


                                                                    NARES, J.

I CONCUR:


BENKE, Acting P. J.


I CONCUR IN THE RESULT:


HALLER, J.