Filed 9/26/14  P. v. Camacho CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FRANKEY JAMAR CAMACHO,<br><br>    Defendant and Appellant. | F066952<br><br>(Super. Ct. No. CRM022973A)<br><br>**OPINION** |

-ooOoo-

### THE COURT*

APPEAL from a judgment of the Superior Court of Merced County.  Mark V. Bacciarini, Judge.

James Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Lewis A. Martinez and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*        Before Poochigian, Acting P.J., Franson, J. and Peña, J.

A jury convicted appellant Frankey Jamar Camacho of attempted robbery (Pen. Code, §§ 654/211).[1]  In a separate proceeding, the court found true a prior prison term enhancement (§ 667.5, subd. (b)) and allegations that Camacho had a prior conviction within the meaning of the three strikes law (§ 667, subds. (b)-(i)).

On March 19, 2013, the court struck the prior prison term enhancement and sentenced Camacho to a six-year term, the upper term of three years doubled because of Camacho's prior strike conviction.

On appeal, Camacho contends:  1) the court erred when it admitted a statement by him that was obtained in violation of *Miranda*;[2] and 2) the court committed instructional error.  We will affirm.

## FACTS

Edward Varner worked as a sales representative for Interstate Brands, Hostess Cake, supplying stores with Hostess products.  On May 17, 2012, at approximately 5:30 a.m., while making deliveries, Varner parked, back end first, outside of a 7-Eleven store in Merced.

The back of the truck had a sliding door, a metal partition, and a table located behind the driver's seat where Varner would put orders together.  As Varner prepared an order, with his back towards the sliding door, he heard someone say, "Hey buddy," and then some mumbling.  Varner ignored the voice because two to three times a day homeless people would ask him for handouts.  He then heard someone say, "Hey, buddy," more aggressively and then he heard the word "wallet."  Varner turned around and saw a Black male standing at the door with his jacket pulled over his face covering the lower part and making a motion with his hand under his shirt as if he had a gun. Varner walked to the door and asked, "What did you say?"  The male responded, "Give

---

[1]    All further statutory references are to the Penal Code, unless otherwise indicated.

[2]    *Miranda v. Arizona* (1966) 384 U.S. 436.

2

me your wallet." Varner leaned out and saw a second Black male, whom he identified in court as Camacho, standing next to the delivery truck, about a foot behind the first male.[3] Varner then said, "What the heck is wrong with you[,]" slammed the door shut, and got behind the metal partition. A short time later, Varner looked out of the truck, saw Camacho and the other male run together across the street and down an alley, and he dialed 911 on his cell phone.

During the encounter with Varner, Camacho looked at Varner, but did not say anything. However, according to Varner, from his vantage point Camacho should have been able to see the whole parking lot, including its two entrances. Additionally, Camacho was positioned so that if someone were to walk on the sidewalk behind the truck, he would block the view of what the other male was doing. In Varner's opinion, Camacho was shielding the second male from being seen by anyone.

After Camacho and another male were detained, Varner identified Camacho as one of the males who attempted to rob him. Officers searched the area where they had established a perimeter and found a short pair of dark colored pants and a black, tan and white sweatshirt. The sweatshirt and pants appeared to be the same ones Camacho was wearing in one of the surveillance videos the prosecution introduced into evidence.

Merced Police Officer Ronald Luker testified that after responding to a robbery call, he saw Camacho, who was wearing a red shirt, and another Black male walking at the corner of S Street and 19th Street.[4] As Officer Luker approached them, the other male took off running eastbound and Camacho began walking westbound. Officer Luker detained Camacho. After advising Camacho of his *Miranda* rights, Officer Luker asked where Camacho was coming from. Camacho responded he was coming from his

---

[3] According to Varner, Camacho was wearing a shirt that was red around the top.

[4] The attempted robbery of Varner occurred near the intersection of R Street and 18th Street.

3

mother's house on Phoenix. This placed Camacho walking towards his mother's house, which was located northwest of that location.

*The Evidence Code Section 402 Hearing*

During Officer Luker's testimony, the court excused the jury while it conducted an Evidence Code section 402 hearing to rule on the defense's *Miranda* objection to the admission of Camacho's statement to Officer Luker that he was coming from his mother's house. During the hearing, Officer Luker testified that he read Camacho his *Miranda* rights and Camacho seemed to understand them. Camacho did not say whether or not he would talk to the officer, but since he did not request a lawyer, Officer Luker continued to speak with him. At that point, the court granted defense counsel's request to voir dire the officer.

In response to defense counsel's questions, Officer Luker testified that he read Camacho his *Miranda* rights from a department-issued card. He also acknowledged that Camacho then told him that he did not understand his rights. Officer Luker further testified that he asked Camacho if he had ever had his *Miranda* rights read to him and Camacho replied he had and that he did not know why he was having his rights read to him. Officer Luker explained to Camacho that he was investigating a strong armed robbery and Camacho was identified as one of the perpetrators. Camacho responded that he did not know what the officer was talking about. Officer Luker next asked Camacho if he was on parole for a robbery and he responded hesitantly that he was. Camacho also said he was coming from his mother's house.

Defense counsel then told the court that he did not believe the foregoing responses showed Camacho understood his *Miranda* rights and the court asked the prosecutor to respond. The following colloquy soon followed:

> "THE COURT: [Prosecutor], your response to that?
>
> "[PROSECUTOR]: Well, Officer Luker followed up with 'I asked him if he ever had his rights read to him and he stated that he had.' So I see that as disingenuous that he didn't understand.

4

"THE COURT: Well, I agree with that. I agree it's disingenuous. I agree."

After further voir dire and argument, the court found that Camacho understood the *Miranda* admonitions and overruled the defense objection to Camacho's statement stating:

"The first issue is, the issue of the voluntariness of his statement. Based on the questioning by Officer Luker and Mr. Camacho's response, 'I don't even understand. I don't know why you're bugging me. I didn't do nothing,' basically rise to be untruthful. I think that he knew why the officers were there based on what I've seen so far in this case and that was part of his plan to absolve himself of responsibility for it. [¶] So I do believe that he did understand his rights. And I agree with the prosecutor that there was no unequivocal, clear invocation of the rights. So I do find his statements were voluntary."

## DISCUSSION

### *The Miranda Issue*

Camacho contends that since he did not expressly waive his *Miranda* rights, the court must have found that he impliedly waived these rights. However, according to Camacho, since an implied waiver may only be found when a suspect understands his *Miranda* rights, he could not have impliedly waived these rights because he stated he did not understand them. We disagree.

"The basic rule of *Miranda*, *supra*, 384 U.S. 436, and its progeny, is familiar: Under the Fifth Amendment to the federal Constitution, as applied to the states through the Fourteenth Amendment, '[n]o person ... shall be compelled in any criminal case to be a witness against himself ....' (U.S. Const., 5th Amend.) 'In order to combat [the] pressures [of custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights' to remain silent and to have the assistance of counsel. (*Miranda*, at p. 467.) '[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial' [citation], at least during the prosecution's case-in-chief [citation]." (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162 (*Lessie*).)

5

"It is further settled, however, that a suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases. A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision. [Citation.] We have recognized that a valid waiver of *Miranda* rights may be express or implied. [Citations.] A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights. [Citations.] In contrast, an unambiguous request for counsel or a refusal to talk bars further questioning. [Citation.]

"Although there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation." (*People v. Cruz* (2008) 44 Cal.4th 636, 667-668.)

"In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda v. Arizona, supra,* 384 U.S. 436, the scope of our review is well established. '*We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported.* [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.'" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1032-1033.)

Here, Officer Luker read Camacho his *Miranda* rights after detaining him but prior to asking him any questions. Camacho did not invoke his *Miranda* rights until he stopped speaking with Officer Luker sometime after telling him that he was coming from his mother's house. Although Camacho told Officer Luker he did not understand his *Miranda* rights, the court did not believe Camacho's statement.

As a parolee, Camacho was familiar with the criminal justice system and his constitutional rights. He also admitted that he had his *Miranda* rights read to him on previous occasions and he displayed his familiarity with these rights when he asked Officer Luker why he was reading them to him. (Cf. *Lessie*, *supra*, 47 Cal.4th at p. 1169 [in concluding juvenile understood *Miranda* warnings, court noted that although there

6

was no evidence the juvenile had previously been given warnings, juvenile was familiar with justice system by virtue of two prior arrests].)  Further, there was no evidence that Camacho had any type of mental or learning disability that prevented him from understanding the language used to advise him of these rights.  Additionally, the court could reasonably find that Camacho's invocation of his rights by refusing to answer any questions after stating that he was coming from his mother's house belied his assertion that he did not understand those rights.  Thus, substantial evidence supports the court's determination that Camacho was being untruthful when he stated that he did not understand his *Miranda* rights.

Camacho contends that once he told Officer Luker he did not understand his *Miranda* rights, the officer was only entitled to ask him questions to clarify this statement (see e.g. *People v. Williams* (2010) 49 Cal.4th 405, 428; *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219) and that this was not the purpose of the ensuing questions. He further contends the court used the fact that at some unknown time he waived his *Miranda* rights to find that he waived his rights here.  Camacho is wrong.

We agree that Camacho could not waive his *Miranda* rights if he did not understand them.  Thus, the threshold issue for the trial court was whether Camacho was being truthful when he stated he did not understand these rights.  It is clear from the court's quoted comments that it relied on Camacho's statement that he had been read his *Miranda* rights on prior occasions and the other circumstances it cited to conclude only that Camacho was being untruthful when he said he did not understand these rights.  The court did not, as Camacho contends, accept his assertion that he did not understand his *Miranda* rights but nevertheless use his prior contacts with authorities to find a waiver of these rights.  Further, since substantial evidence supports the court's finding that Camacho understood his *Miranda* rights and Camacho waived these rights by continuing to answer Officer Luker's questions, there was nothing improper in the officer's

continued interrogation of Camacho. Accordingly, we conclude that the court's admission of Camacho's statements to Officer Luker did not violate *Miranda*.

In any event, *Miranda* error is reversible unless it was harmless beyond a reasonable doubt. (*In re Z.A.* (2012) 207 Cal.App.4th 1401, 1422.)

"'All persons concerned in the commission of a crime, ... whether they directly commit the act constituting the offense, or aid and abet in its commission, ... are principals in any crime so committed.'" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117.) "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense; (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

Here, appellant accompanied another male as they walked past a Hostess truck, apparently casing the truck. He then returned with the male and stood next to him in a manner that shielded the other male's illicit conduct from passersby, as the other male told Varner three times to give him his wallet and simulated a gun under his shirt. Camacho also fled with the other male after Varner closed the truck door. Additionally, the jury could reasonably find that Camacho discarded the jacket and pants he was wearing in an obvious attempt to thwart being identified as a participant in the attempted robbery of Varner. The jury could also reasonably find from these circumstances that Camacho must have heard the other male as he demanded Varner turn over his wallet, that he did not disassociate himself from the other male's conduct because he intended to assist him in robbing Varner, and that he aided and encouraged the second male to rob Varner, albeit unsuccessfully, by standing next to him and shielding him from passersby.

Camacho did not present any evidence to contradict this evidence. Further, since the evidence that Camacho aided and abetted the other male in attempting to rob Varner

8

was unrebutted, we conclude that if *Miranda* error occurred, it was harmless beyond a reasonable doubt.

## *The Alleged Instructional Error*

Camacho contends the evidence showed only that he accompanied the second male and that he did not undertake any actions that showed he intended to commit a robbery. Camacho further contends that one reasonable interpretation of the evidence is that he may have believed his accomplice intended to ask Varner for some pastries, which was common for homeless people to do and that he did not form the intent to steal the victim's property until after the assault. Thus, according to Camacho, the court erred by its failure to sua sponte instruct the jury on attempted theft as a lesser included offense of attempted robbery. We will reject Camacho's claim of instructional error.

> "A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] *Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense.* [Citation.] 'The rule's purpose is ... to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence.' [Citation.] In light of this purpose, the court need instruct the jury on a lesser included offense *only '[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of' the lesser offense.*" (*People v. Shockley* (2013) 58 Cal.4th 400, 403-404, italics added.)

> "''"On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense."''" (*People v. Verdugo* (2010) 50 Cal.4th 263, 293.)

> "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) "[R]eversal is not warranted unless an examination of 'the entire cause, including the evidence,' discloses that the error produced a 'miscarriage of justice.' [Citation.] This test is not met unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred." (*Id*. at p. 149.)

9

Since theft is a lesser included offense of robbery (*People v. Bradford, supra,* 14 Cal.4th 1005), it follows that attempted theft is a lesser included offense of attempted robbery. (*Id*. at p. 1055.) However, if the intent to steal arose only after the victim was assaulted, the robbery element of stealing by force or fear is absent. (*Id.* at pp. 1055-1056.)

During the attempted robbery, Camacho was close enough to see his accomplice cover his lower face, simulate having a gun under his shirt, and to hear him demand that Varner turn over his wallet. There was also no apparent reason for Camacho to believe that Varner would simply hand over his wallet without Camacho or his accomplice using fear or force to convince him to do so. Further, Camacho did not disavow himself of his accomplice's conduct when it became apparent that his accomplice was not attempting to steal pastries without using force or fear. Nor did Camacho testify regarding when he formed the intent to steal. Thus, the record does not contain any evidence from which it can be inferred that Camacho formed his intent to steal only after the victim was assaulted or any other basis for the court to instruct on the lesser included offense of attempted theft.

Camacho misplaces his reliance on *People v. Ramkeesoon* (1985) 54 Cal.3d 346 (*Ramkeesoon*) to contend otherwise. In *Ramkeesoon,* the morning after he spent the night in the victim's apartment, the defendant stabbed the victim to death. Before leaving the apartment, he took the victim's wallet, keys, and watch. The defendant testified that he had not thought about taking any of the victim's property until the assault was completed. In finding the court erred by its failure to instruct the jury on theft as a lesser included offense of robbery, the *Ramkeesoon* court stated:

> "Clearly the evidence in this case warranted an instruction on theft as a lesser included offense. *Defendant testified that he had not thought about stealing any of [the victim's] property until after the assault was completed....* [Citation.] Although the jury was not required to believe defendant's testimony, it was credible enough to have supported a verdict of theft instead of robbery." (*Ramkeesoon*, *supra*, 54 Cal.3d at p. 351.)

10

*Ramkeesoon* is easily distinguishable because in that case the defendant's testimony provided substantial evidence from which the jury could conclude that defendant was guilty only of theft. As noted, Camacho did not testify and there is no other evidence in the record that indicates that Camacho aided and abetted the other male in committing any offense less than attempted robbery. Accordingly, we reject Camacho's claim of instructional error.

In any event, the failure to charge the jury on a lesser included offense is harmless unless it is reasonably probable the defendant would have received a more favorable result in the absence of the error. (*Breverman, supra,* 19 Cal.4th at pp. 164-165.) For the reasons discussed in the previous section, including that the prosecution evidence was unrebutted, we conclude that any error in failing to charge the jury on attempted theft was harmless.

## DISPOSITION

The judgment is affirmed.