Filed 2/19/21  P. v. Richmond CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ELDRICK RICHMOND,<br><br>Defendant and Appellant. | F078340<br><br>(Super. Ct. No. BF170010A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Rachelle A. Newcomb, Lewis A. Martinez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Eldrick Richmond was convicted of first degree premeditated murder after he beat and strangled a woman he met only hours earlier.  He raises two claims to challenge the

conviction. First, he contends the court erred by denying his motion to suppress inculpatory statements in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Second, he argues the court erred in permitting the prosecutor to present evidence of prior acts of domestic violence in violation of Evidence Code section 1101. We reject the first claim but find merit in the second.

We conclude, however, the error was prejudicial only to first degree murder. It was harmless to the necessarily lesser included offense of second degree murder. The proper remedy is to reverse the first degree murder conviction and remand to the trial court where the People may elect to retry Richmond for first degree murder or accept a reduction to second degree murder.[1]

## DISCUSSION

**Charges**

The Kern County District Attorney charged Richmond with one crime: Murder (Pen. Code,[2] § 187, subd. (a)). It was further alleged Richmond had suffered a prior serious felony conviction and a prior strike conviction. (§§ 667, subd. (a); 667, subds. (b)-(i) & 1170.12, subds. (c)-(g).)

**Trial Evidence**

While Richmond was staying in a motel room, he called 911, described "going through it with" a woman, and asked to have an "ambulance come get her ass." A law enforcement officer arrived first. He found a woman—the victim—dead on the floor in the room, "cold stiff" without a pulse. The victim had "major bruising on her face and blood coming out of her mouth" or nose.

---

[1] Richmond also raised separate challenges to the resulting sentence. These claims are rendered moot.

[2] Undesignated statutory references are to the Penal Code.

Richmond told the officer, " 'She came at me with a stick. I defended myself. I took a shower and called you guys. Can I smoke a cigarette?' " The officer "detained … him in handcuffs" and another officer "escorted [Richmond] to the back of [a] patrol vehicle …."

While walking to the patrol vehicle, Richmond said "he had just met the [victim] earlier in the day and invited her to his room." At some point when they were in the room, "he found [her] going through his possessions." "He told her to stop" but "she refused so he grabbed her by the throat and punched her twice in the face." He then took a shower.

Once in the patrol car, Richmond continued talking about the incident. He thought the victim was "trying to set [him] up and … rob" him. He was later formally interviewed by detectives. He told the detectives he just met the victim earlier that morning and they rented a motel room together "close to three" a.m.. His priority was to take a shower. At some point while in the room together the victim started asking about money. He became suspicious of a robbery after she began opening the curtains. The victim eventually started going through his backpack and pants, leading him to believe she was looking for his wallet.

According to Richmond he longer felt comfortable showering because he could not "trust" the victim. They started "arguing" and the victim "grab[bed] a stick or something …."[3] He was "not worried about her with a stick" or "hurting [him] with a stick." The victim "c[a]me at" him and he "grabbed her and went down," landing on "her neck" with his forearm.[4] He took "the stick" and put his "forearm" on her "neck …." He hit her "three or four" times.

---

[3] Near the victim "was a stick … approximately two feet in length and about two inches in diameter similar to a … closet" rod.

[4] The interview with detectives was videotaped. Richmond is seen demonstrating the fall on the victim's neck.

Richmond then grabbed the victim's neck with both hands.[5] He was "mad" and "angry …." When he got up off the floor to take a shower "she didn't do anything." As he stood up, he noticed her eye and felt "[s]adness" and "in trouble." He took "[a] long shower"[6] and "[w]hen [he] got out … she was still in the same position. It was bad." He knew "[s]he was dead."

A pathologist explained the victim's injuries were "consistent with left-hand manual strangulation with signs of considerable pressure at the throat." The left eye was bloodied. "The other eye [was] damaged by blunt force …." "[T]here were bruises all over the head." In his opinion, "Manual strangulation [was] the cause of death."

**Verdict and Sentence**

Richmond was convicted as charged. He was sentenced to serve 55 years to life in prison.

## DISCUSSION

Prior to trial, the court separately addressed the admissibility of Richmond's inculpatory statements and the evidence he committed prior acts of domestic violence. Of particular relevance to the *Miranda* claim are Richmond's statements while detained in the patrol vehicle and the later interview with detectives.[7] He claims the interview with detectives was improperly admitted into evidence because he had already invoked his right to silence. Although he did in fact invoke his right to silence, we will conclude the interview with detectives was admissible.

---

[5] In the video, Richmond demonstrates a two-handed grasp in a manner consistent with placing both hands completely around a person's neck.

[6] Richmond said he entered the shower around 9:37 a.m.. He called 911 a few minutes before 11 a.m..

[7] Other statements not at issue include the 911 call, a conversation with the first responding officer, and a statement while being escorted to the patrol car.

As for the prior acts evidence, the court ruled the prosecutor could introduce that evidence to prove intent to kill or lack of absence or mistake. Richmond claims this ruling was error. We agree.

## I. Richmond's Interview Was Properly Admitted

The trial court granted in part and denied in part Richmond's motion to suppress his statements made to law enforcement.[8] It was granted as to certain statements[9] uttered in the patrol car. It was denied as to the interview with detectives.

The court ruled the interview with detectives was admissible because Richmond, despite previously invoking his right to silence, "voluntarily reinitiate[d] contact to discuss the case further ...." We find the statement properly admitted because Richmond reinitiated contact, subsequently waived his rights, and provided a voluntary statement.

### A. Additional Background

Law enforcement officers detained Richmond at the motel after finding the victim lying dead in his motel room. Richmond was handcuffed, seated in the backseat of a patrol car, and, without any prompt, began talking about the victim. The officer asked Richmond if he knew the victim's name, followed up with if he knew her "at all," and if he "let her into [the] room." Richmond continued to explain what happened that morning and said he "had her by the neck."[10]

At that point, the officer informed Richmond of his rights. Richmond invoked his right to silence and, in the course of doing so, acknowledged he did not feel coerced and "really want[ed] to talk." About 25 minutes later,[11] he resumed talking:

---

[8] The motion was broadly raised and did not identify any specific statement for suppression. The People filed a separate motion to admit all of his statements.

[9] For clarity's sake, all statements summarized in the background *ante* were admitted at trial.

[10] These statements were suppressed.

[11] There was no conversation during these approximate 25 minutes.

| | |
|---|---|
| Richmond: | "Officer, do they need the key?" |
| Officer: | "I'm sorry?" |
| Richmond: | "They need the key, the key back?" |
| Officer: | "Say it one more time." |
| Richmond: | "They need the key? I have it in my pocket –" |
| Officer: | "Oh, okay. Hold on real quick." |

The officer did not ask any other questions. Less than 30 seconds later Richmond renewed the discussion about the victim. As he was explaining the victim was looking for "money," the officer interrupted him to tell him detectives would "come and talk to" him at "the station …." Richmond acknowledged the officer, made a few more comments about the victim and then, presumably, was transported to the station.

Before asking any questions, detectives at the station again informed Richmond of his constitutional rights to counsel and silence. Richmond then participated in the interview summarized in the background *ante*.

**B. Analysis**

"The basic rule of *Miranda, supra,* 384 U.S. 436, and its progeny, is familiar: Under the Fifth Amendment to the federal Constitution, as applied to the states through the Fourteenth Amendment, '[n]o person … shall be compelled in any criminal case to be a witness against himself ….' (U.S. Const., 5th Amend.) 'In order to combat [the] pressures [of custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights' to remain silent and to have the assistance of counsel. [Citation.] '[I]f the accused indicates in any manner that he [or she] wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him [or her] at his [or her] trial' … during the prosecution's case-in-chief …." (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162.)

" '[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends … on whether [the] "right to cut off questioning" was "scrupulously honored." ' " (*People v. Krebs* (2019) 8 Cal.5th 265, 314 (*Krebs*).) "[P]ost-invocation statements are admissible … only where the People demonstrate both that the [accused] *reinitiated* conversation with law enforcement officers, and that the suspect waived any previously invoked *Miranda* rights." (*In re Z.A.* (2012) 207 Cal.App.4th 1401, 1418, emphasis added.)

" 'An accused "initiates" ' further communication, when his words or conduct 'can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation." ' " (*People v. Molano* (2019) 7 Cal.5th 620, 656 (*Molano*).) " '[T]here is no warrant for presuming coercive effect where the [accused's] initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second [warned] statement was also voluntarily made.' " (*Bobby v. Dixon* (2011) 565 U.S. 23, 29 (*Bobby*).) "The finding of 'initiation' in and of itself is 'reviewed for substantial evidence' …." (*People v. Waidla* (2000) 22 Cal.4th 690, 731; *People v. Gamache* (2010) 48 Cal.4th 347, 385.)[12]

The facts here readily support the conclusion Richmond reinitiated a voluntary conversation about the investigation. While Richmond was detained in the patrol car, the officer asked him if he knew the victim's name, if he knew her, and if he let her in his motel room. Richmond began describing the events culminating in homicide.[13] The

---

[12] Richmond "acknowledges" this deferential standard of review "but contends" it is "subject to reconsideration." Any reconsideration on this point is for the California Supreme Court, not this court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

[13] Again, the trial court ruled these statements were inadmissible.

officer then gave Richmond the standard *Miranda* admonition.  Richmond invoked his right to silence.

Nearly 25 minutes later, Richmond asked the officer if "they" needed the key to the room.  The officer apparently did not hear and asked Richmond to "say that one more time."  Richmond repeated himself and the officer said, "Oh, okay.  Hold on real quick."  Without any further prompt, Richmond began explaining the circumstances preceding the homicide.  The officer then let Richmond know detectives would speak to him at "the station …."

Richmond's continued comments in the patrol car about the victim were clearly not "relating to routine incidents of the custodial relationship …."  (*Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1045 [questions about custodial process do no reinitiate conversation for *Miranda* purposes].)  Rather, they could be " ' "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation." ' "  (*Molano, supra,* 7 Cal.5th at p. 656.)

Importantly, there was no inkling of involuntariness during the detention in the patrol car.[14]  (See *People v. Sanchez* (2019) 7 Cal.5th 14, 50 [a statement is involuntary if, under " 'the totality of the circumstances,' " " ' "the defendant's 'will was overborne at the time he confessed.' " ' "].)  Indeed, Richmond, despite invoking his right to silence, contemporaneously stated he did not feel coerced and instead "really want[ed] to talk,"  which he then continued to do of his own volition.

Critically, the detectives at the station again advised Richmond of his constitutional rights to counsel and silence.  Richmond acknowledged his rights and impliedly waived them by participating in the interview.  (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 ["An 'implicit waiver' of the 'right to remain silent' is sufficient to

---

[14] These statements were audio recorded.  The officer's tone does not suggest anything accusatorial or adversarial.

admit a suspect's statement into evidence."].)  There was no inkling of involuntariness in this statement.  "As long as [Richmond] validly waived the *Miranda* protection and voluntarily confessed, the statements are admissible."  (*Krebs, supra,* 8 Cal.5th at p. 302.)  This is what occurred in this case.

In arguing otherwise, Richmond cites *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*).  There, "the high court confronted a situation where the interrogating officer 'made a "conscious decision" to withhold *Miranda* warnings.'  [Citation.]  The police officer testified that he did so in accordance with 'an interrogation technique he had been taught:  question first, then give the warnings, and then repeat the question "until I get the answer that [the suspect] already provided once." '  [Citation.]  Another police officer testified that his department 'promoted' 'the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession.' "  (*Krebs, supra,* 8 Cal.5th at p. 308.)

"[A] majority of the high court found the warned confession inadmissible.  [Citations.]  The court fractured, however, on why that is so.  A plurality of four justices explained that 'when interrogators question first and warn later' [citation], the later, warned confession is admissible only if 'in the circumstances the *Miranda* warnings given could reasonably be found effective.'  [Citation.]  Under the facts of the case, the four justices concluded that the circumstances 'do not reasonably support a conclusion that the warnings given could have served their purpose,' and the postwarning statements therefore were inadmissible."  (*Krebs, supra,* 8 Cal.5th at pp. 308-309.)

"In Justice Kennedy's view, the plurality's test 'cut[] too broadly.'  [Citation.]  Justice Kennedy instead 'would apply a narrower test applicable only in the infrequent case … in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.' "  (*Krebs, supra,* 8 Cal.5th at p. 309.)

"The fractured nature of *Seibert* has given rise to a debate over whether it is the plurality's opinion or Justice Kennedy's concurrence that provides the controlling

9.

standard. [Citations.] We need not decide the matter here, as the result in this case would be the same under either approach." (*Krebs, supra,* 8 Cal.5th at p. 309.)

"Under the plurality's approach," we ask " 'could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?' [Citation.] In making this determination, the … court is to consider a number of factors, including 'the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.' " (*Krebs, supra,* 8 Cal.5th at pp. 309-310.) None of these factors assist Richmond.

In the initial statement in issue, the officer in the patrol car asked Richmond three questions prior to giving the *Miranda* warning. These questions were cursory, not pointed or probing. It simply was not an interrogation. To the extent there was minimal overlap with the second, more detailed interview, it was due to Richmond's penchant for speaking, not the officer's questions.

The timing and setting of each statement was different. The first questions were asked by an officer while on scene at the motel. The second round were asked by detectives at the station. The detectives did not treat the interview as continuous with the officer's cursory questions. In fact, the detectives did not reference any prior statement at all. Accordingly, the questioning did not "blend[] into one 'continuum.' " (See *Bobby, supra,* 565 U.S. at p. 31.)

Finally, Richmond invoked his right to silence when first given the *Miranda* warning. He then continued talking and was not "interrogat[ed]" until *after* he was again given the warning. (*People v. Sims* (1993) 5 Cal.4th 405, 440 ["interrogation" means "express questioning and 'its functional equivalent' "].) The officer's benign follow up to Richmond's "key" inquiry did not constitute interrogation. Because nothing improper

10.

occurred between Richmond's invocation and subsequent waiver, the second *Miranda* warning was as effective as the first. In other words, he retained a very real choice about whether to waive or invoke his rights.

Similarly underwhelming are the facts to support finding a deliberate strategy to undermine the *Miranda* warning. "Although Justice Kennedy 'did not articulate how a court should determine whether an interrogator used a deliberate two-step strategy,' " the following factors are relevant. (*Krebs, supra,* 8 Cal.5th at p. 310.) "There is no evidence" the first officer deliberately withheld " '*Miranda* warnings until after interrogating and drawing out a confession,' or that [he] was following such a [departmental] policy …." (*Ibid.*)

As we have already stated, the officer in the patrol car asked a few brief questions about the relationship between Richmond and the victim. While we do not doubt those questions were broad enough to trigger the *Miranda* warning, we also observe the fact Richmond and she had *some* relationship was undeniable. After all, he had already described "going through it with her" and summoned help to "come get her ass" while she lay dead in his motel room.

In these circumstances, it appears the officer simply "failed to 'realize that … warnings [were] required.' " (*Krebs, supra,* 8 Cal.5th at p. 311.) The officer quickly realized his mistake when Richmond ultimately stated, "I had her by the neck." The officer then provided the *Miranda* warning, ensured Richmond understood it, and scrupulously honored his subsequent invocation.

All told, the most damaging question asked in the patrol car was, "[Y]ou let her into your room?" Nothing in the record reasonably suggests the first officer deliberately withheld the *Miranda* warning to induce a court-admissible confession.

For all these reasons, we conclude the trial court's finding of reinitiation is not only supported by substantial evidence but manifestly correct. The interview with

11.

detectives was admissible because it was voluntary and preceded by an implicit waiver of rights. The *Miranda* claim fails.

## II. The Prior Domestic Violence Evidence Was Inadmissible

The trial court ruled the prosecutor could present evidence Richmond had previously physically abused three separate women with whom he was in a dating relationship. Richmond contends this ruling was error. The People urge the evidence was admissible to prove intent to kill and to disprove accident or mistake. We agree with Richmond.

The evidence was not admissible to prove intent to kill. Based on the record, however, we find the error prejudicial only to first degree premeditated murder. The necessarily lesser included offense of second degree murder is not affected.

### A. Additional Background

The prosecutor filed a motion "seek[ing] to introduce evidence of [Richmond's] acts of assault and spousal abuse pursuant to Evidence Code section 1101(b) for the limited purpose to show intent (absence of mistake or accident)." Richmond opposed the motion, arguing the prior acts were too dissimilar to prove intent.

After hearing argument and "read[ing] and consider[ing] the briefs," the court ruled as follows:

> "[T]he evidence that is being presented is that the defendant has beaten women, particularly in the face, not in self-defense on previous occasions. The Court finds this relevant to rebut the implied self-defense claim of the defendant in a statement to law enforcement; that is, it is not really in absence of mistake or accident, which would be a common exception to allow this evidence in to the charged crime. But absence of a danger justifying assault by the defendant. That is in essence. It goes to both intent and the motive of the defendant in committing the assaults."

12.

Ultimately, the prosecutor introduced into evidence the fact Richmond committed two prior acts of domestic violence.[15]  The court instructed the jury this evidence was relevant only to prove intent to kill, motive, or absence of accident or mistake.

**B. Analysis**

" 'Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity.  [Citations.]  The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect.  [Citation.]  When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant.  [Citation.]  Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." ' "  (*People v. Fuiava* (2012) 53 Cal.4th 622, 667; Evid. Code, § 1101.)

"To be admissible, there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented.  The least degree of similarity is needed when, as here, the evidence is offered to prove intent.  [Citation.]  As we have often explained, the recurrence of a similar result tends to negate an innocent mental state and tends to

---

[15] The evidence for each prior incident is summarized as follows.  In one, a woman was in a dating relationship with Richmond.  He was angry "her children were making too much noise" so he "struck her several times in the face, causing a visible injury …."  In the other, a woman was in a romantic relationship with Richmond and, during an unexplained argument in a car, he "hit [her] on [the] head.  [They] started fighting in the car" before the woman got away.  Evidence of a third prior incident was not presented to the jury.

13.

establish the presence of the normal criminal intent." (*People v. Jones* (2011) 51 Cal.4th 346, 371 (*Jones*).)

"And even to negate accident or mistake [or self-defense] (that is, to show criminal intent), although the 'least degree of similarity' is required [citation], the incidents must be similar enough to support the inference that the defendant probably bore the same intents each time." (*People v. Williams* (2018) 23 Cal.App.5th 396, 420 (*Williams*).) The " 'court must look behind the label describing the kind of similarity or relation between the other offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong.' " (*People v. Jefferson* (2015) 238 Cal.App.4th 494, 504.)

The incidents here were not similar enough to prove intent to kill. The most obvious dissimilarity is that Richmond did not kill, let alone attempt to kill, the women in the prior incidents. *Williams, supra,* illustrates the point. There, the defendant was charged with murder for stabbing and killing his wife. To prove first degree premeditated murder, the People introduced evidence of the defendant's prior conviction for "shooting with intent to kill …." (*Williams, supra,* 23 Cal.App.5th at p. 400.) In the prior incident, the defendant had shot his previous wife's mother during a struggle with his then wife. (*Id*. at p. 401.)

The Third District Court of Appeal concluded "the dissimilarity between the two incidents is so great that the evidence of the uncharged act had no (or very little) 'tendency in reason' [citation] to speak to defendant's mental state during the charged act." (*Williams, supra,* 23 Cal.App.5th at p. 413, fn. omitted.) "The Attorney General argue[d] that the two incidents were sufficiently similar because both 'involved a domestic violence situation,' and any differences in the circumstances merely [went] to the weight of the evidence, not its admissibility to show intent." (*Id*. at p. 420.) The

14.

appellate court concluded "there was nothing suggesting premeditation or deliberation about the [prior] incident ….  Apart from the fact that a troubled marriage was involved in both cases, they are completely different kinds of incidents.  They are not of the kind where the former sheds any probative light on the latter …." (*Ibid*.)

Here, too, the prior incidents were of completely different types than the charged offense.  The prior incidents involved romantic relationships and domestic disputes in which Richmond battered his girlfriends *without* an intent to kill.  The charged offense involved an apparent dispute over money or privacy.[16]  That the victim in this case was also a woman is irrelevant—nothing in the record suggests the fact she was a woman was material to the crime.

It is true Richmond struck each victim, past and present, in the face.  That is certainly not unusual in a battery case.  But the one similarity necessary to unite the evidence is an intent to kill.  There simply is no warrant to infer an intent to kill from acts not involving an intent to kill.  The court erred in admitting the evidence and instructing the jury on this basis.[17]

The error was not harmless.  Intent to kill is necessary to prove first degree premeditated murder.  (See, e.g., *People v. Combs* (2004) 34 Cal.4th 821, 856-857

---

[16] The only evidence in the record that reasonably explains *why* the homicide occurred is Richmond's statement.  Although our justice system does not require the jury to believe any witness, by the same token it forbids unreasoned speculation.  For example, " 'the People may not conjure up an attempted rape [theory] in order to introduce evidence of another rape.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 23-24.)  Distorting the present circumstances to fit prior acts is improper.

[17] On appeal, the People argue "[e]vidence of Richmond's prior acts of domestic violence undermined his claim that he was acting in self-defense, that he had no intent to kill …, and that [the] death was an accident."  The jury was not instructed the evidence was relevant to disprove self-defense, nor was it admitted on that basis.  In any event, the dissimilarities rendering the evidence inadmissible to prove intent to kill, render it inadmissible to negate accident, mistake, and self-defense.  (See *Jones, supra,* 51 Cal.4th at p. 371.)

["implied malice [does] not apply to … first degree deliberate, premeditated murder"; *People v. Soto* (2018) 4 Cal.5th 968, 970 ["Express malice requires an intent to kill … but implied malice does not."].) So are premeditation and deliberation. (§ 189, subd. (a).) Yet the evidence to prove intent to kill in this case was slight and purely circumstantial.[18] Premeditation and deliberation are dependent upon intent to kill; they cannot be proven without it.[19]

Richmond is the only person who could explain what happened in the motel room that morning. According to him, he hit the victim and grabbed her neck in an effort to prevent her from rummaging through his property. Whether or not that is true, nothing about the explanation signals premeditation and deliberation. No other evidence introduced at trial concretely established these elements.

On this record we cannot dismiss the possibility the jury would have found the prior incidents—as the court so instructed—relevant to intent to kill and thus relevant to the attendant relationship with premeditation and deliberation. (See *People v. Williams* (2017) 7 Cal.App.5th 644, 678 [" 'Erroneous admission of other crimes evidence is prejudicial if it appears reasonably probable that, absent the error, a result more favorable to the defendant would have been reached.' "].) Absent the error, we believe it is reasonably probable at least one juror could have reasonably doubted the murder was premeditated and deliberate. (See *In re Long* (2020) 10 Cal.5th 764, __ [one juror harboring reasonable doubt is prejudice sufficient for reversal].)

---

[18] Richmond does not challenge the sufficiency of the evidence.

[19] In this regard the jury was instructed with CALCRIM No. 521, which, as relevant, provides: "The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the acts that caused death."

16.

The error was not, on the other hand, prejudicial to second degree murder. Second degree murder requires either implied or express malice.[20] Implied malice entails an act dangerous to life coupled with knowledge of that danger and a conscious disregard for life. (*People v. Cravens* (2012) 53 Cal.4th 500, 508.) The prior acts evidence was entirely divorced from proving a conscious disregard for life, an element the record otherwise overwhelmingly proved.

Richmond admitted hitting the victim in the face and placing his hands around her neck. Her face was brutalized with both eyes apparently swollen shut and darkened with bruises. Blood was streaming down her face.[21] He then strangled her, causing her death.

There is no disputing Richmond's actions were dangerous to life. There is no doubt he knew they were dangerous. There is only one reason to savagely beat and choke another person: To inflict life-endangering injury. Any doubt he acted with conscious disregard for life is quickly dispelled by the fact he admitted he saw extensive damage to the victim's right eye, left her languishing on the floor, decided to take a one hour long shower before offering *any* assistance, and, knowing she was dead, callously called for someone "to come get her ass."

This record leads us to conclude there is no reasonable probability Richmond would have achieved a result more favorable than second degree murder absent the error. The only other possible verdicts—manslaughter[22] or not guilty—were based on self-defense, imperfect self-defense, and heat of passion. The evidentiary support for these defenses was minimal.

---

[20] Intent to kill is relevant to second degree murder but not relevant to implied malice.

[21] Several photographs depicting the victim's injuries were admitted into evidence. We have reviewed some of them.

[22] The jury was instructed on voluntary manslaughter as a lesser included offense.

For either self-defense or imperfect self-defense to apply, a person must believe in the need to defend oneself.[23] Richmond specifically disclaimed any fear for his safety.

The heat of passion defenses[24] require finding a person of average disposition would act rashly rather than deliberately if placed in the same situation. We do not believe Richmond's prospects of convincing the jury an average person would act rashly in response to theft or even robbery hinged in any way on the fact he had previously committed domestic violence. The points are completely unrelated and, frankly, a person of average disposition would not act rashly under identical circumstances.[25]

In sum, the prior acts evidence was not admissible to prove intent to kill. "The error would not, however, have affected a conviction of the lesser included offense of [second degree murder]. When a greater offense must be reversed, but a lesser included offense could be affirmed, we give the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense." (*People v. Kelly* (1992) 1 Cal.4th 495, 528; *People v. Gonzalez* (2018) 5 Cal.5th 186, 197 [second degree murder is a lesser included offense of first degree premeditated murder]; §§ 1181(6) & 1260.)

---

[23] The court instructed the jury with CALCRIM Nos. 505 (self-defense) and 571 (imperfect self-defense). As relevant, these instructions explain a "defendant [must] reasonably believe[] that he was in imminent danger of being killed or suffering great bodily injury," and a "defendant [must] actually believe[] that he was in imminent danger of being killed or suffering great bodily injury," respectively. The fact Richmond denied any danger severely limited these defenses.

[24] The court instructed the jury with CALCRIM Nos. 511 (accident in the heat of passion) and 570 (voluntary manslaughter based on heat of passion). As relevant, each instruction explains heat of passion requires "a person of average disposition," under the same circumstances at issue in the case, "to act rashly and without due deliberation, that is, from passion rather than from judgment."

[25] Heat of passion *does not* require a person with average disposition to act in the *same manner* as the defendant. It requires only a rash, rather than considered, act. (*People v. Beltran* (2013) 56 Cal.4th 935, 938.)

18.

## **DISPOSITION**

The judgment is reversed.  Upon remand, the prosecutor may accept a reduction to second degree murder or elect to retry Richmond for first degree murder.  If the prosecutor accepts the reduction, the court shall resentence Richmond accordingly.  If the prosecutor elects to retry the first degree murder charge, the court is directed to conduct proceedings consistent with this opinion.


                                                          SNAUFFER, J.

WE CONCUR:


FRANSON, Acting P.J.


SMITH, J.